RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

ALVIN MOORE,

          *Plaintiff-Appellant*,

    *v.*

COCA-COLA BOTTLING COMPANY CONSOLIDATED nka
Coca-Cola Consolidated, Inc.,

          *Defendant-Appellee*.

No. 23-3775

─────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:18-cv-00486—Matthew W. McFarland, District Judge.

Argued:  March 21, 2024

Decided and Filed:  August 22, 2024

Before:  BATCHELDER, MOORE, and CLAY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Donyetta D. Bailey, BAILEY LAW OFFICE, LLC, Cincinnati, Ohio, for Appellant. Pamela E. Palmer, ELARBEE THOMPSON SAPP & WILSON LLP, Atlanta, Georgia, for Appellee.  **ON BRIEF:**  Donyetta D. Bailey, BAILEY LAW OFFICE, LLC, Cincinnati, Ohio, for Appellant.  Pamela E. Palmer, Brent L. Wilson, Gillian G. Furqueron, ELARBEE THOMPSON SAPP & WILSON LLP, Atlanta, Georgia, for Appellee.

    MOORE, J., delivered the opinion of the court in which CLAY, J., joined. BATCHELDER, J. (pp. 24–36), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.　Alvin Moore ("Moore") held various positions at Coca-Cola Bottling Company ("CCBC") from 2015 to 2018.　In March 2017, Moore was involved in an accident at work and underwent drug testing, pursuant to CCBC's drug and alcohol policy.　Moore tested positive for marijuana, although the amount in his sample was less than the amount that CCBC's drug policy prohibits.　CCBC nevertheless negotiated a Second Chance Agreement ("SCA") with its employees' union and Moore, which stated that Moore would be subject to twenty-four months of random drug testing.　Later, in June 2017, Moore was cited as being insubordinate for swearing and inciting a work slowdown during a pre-shift meeting.　Moore was terminated, but his union negotiated a Last Chance Agreement ("LCA") with CCBC.　In a meeting with his supervisor, David Boland ("Boland"), and the union vice president, Frank Arrington ("Arrington"), Moore signed the LCA, which stated that he discharged CCBC from any and all liability relating to his employment.　In 2018, while Moore was still under the SCA and the LCA, he tested positive for marijuana.　He was terminated from CCBC on July 31, 2018, when he was still subject to the SCA, but at which point Moore's LCA had expired.　He sued CCBC for racial discrimination and retaliation, in violation of Title VII and Ohio law, and CCBC moved for summary judgment.　The district court granted CCBC's motion for summary judgment, and Moore timely appealed.　For the reasons explained below, we REVERSE and REMAND for further proceedings.

**I. BACKGROUND**

Moore, a Black man, was hired on March 24, 2015 as a pallet builder by Coca-Cola Refreshments, which became CCBC in October 2016.　R. 67 (Moore Dep. at 65–66) (Page ID #649–50).　He also worked as "a forklift operator [for which he received brief training] and a backup lab technician."　*Id.* at 68 (Page ID #652).　Moore graduated from high school in 2002, after which he attended "some [real estate] courses at Cincinnati State" before receiving his "associate's [degree] in fashion merchandising and design" in 2009 from the Art Institute of

Chicago's Ohio campus. *Id.* at 42–43 (Page ID #626–27). Moore also received a bachelor's degree in health-care administration from the University of Phoenix. *Id.* at 43 (Page ID #627). He "worked at Children's [Hospital] for a while, but [he] needed a master's [degree] to move up further," which is why he took a warehouse job at CCBC. *Id.* at 44–45 (Page ID #628–29).

The International Brotherhood of Teamsters, Local No. 1199 ("the union"), represents CCBC's non-management employees. R. 76-5 (Collective Bargaining Agreement ("CBA") at 2) (Page ID #2500). As part of the CBA, the union and employees are not permitted to "authorize, instigate, cause[,] or participate in any . . . work stoppage[] . . . [or] slowdown." *Id.* at 6 (Page ID #2504). The union also addresses grievances between employees and CCBC "concerning the interpretation or application of [the CBA] arising from an alleged violation of the terms of [the CBA]." *Id.* Local 1199 provided Moore with a copy of the CBA, both in person and electronically, which he reviewed "as necessary." R. 67 (Moore Dep. at 80–81) (Page ID #664–65). Moore stated that his understanding of the CBA's "nondiscrimination" terms was that "discrimination was handled by HR" and that he could grieve a "final determination, but [] couldn't grieve the discrimination part of it." *Id.* at 83 (Page ID #667).

CCBC's Drug and Alcohol Abuse Policy provides that "employees who test positive for drugs, alcohol, or like substances . . . as a result of reasonable suspicion testing shall be subject to immediate discharge." R. 76-8 (CCBC Drug & Alcohol Abuse Policy at 1) (Page ID #2555). The prohibited level of cannabinoids, including marijuana, is set at 50 nanograms ("ng") per milliliter. *Id.* at 6 (Page ID #2560). Per the drug policy, employees who have tested positive for the first time may be suspended without pay and allowed to return if, "as a condition of continued employment," they sign an SCA. *Id.* at 4, 8 (Page ID #2558, 2562). If an employee "tests positive [a] second time for drugs or alcohol within sixty (60) months of [their] initial first positive test result," they are "subject to immediate termination." *Id.* at 4 (Page ID #2558).

On March 28, 2017, Moore "had an accident on the forklift," after which he was drug tested pursuant to company policy. R. 67 (Moore Dep. at 131–32) (Page ID #715–16); R. 69 (Boland Dep. at 115) (Page ID #1341). While Moore was driving the forklift, he saw that some products were "leaning off [of a sizer] platform" and he "inadvertently parked" his forklift in an automated guided vehicle's ("AGV") path when he got off to straighten the product. R. 79-3

(Moore Decl. at 3) (Page ID #2940). The AGV crashed into Moore's forklift, and when Moore tried to move his forklift, the AGV's bumper came off. *Id.* Moore's supervisors considered this to be a workplace accident. *Id.* Company employees who are involved in an accident at work that does not require them to get medical treatment are drug tested on-site by a third-party vendor. R. 69 (Boland Dep. at 117–18) (Page ID #1343–44). Supervisors or managers are responsible for informing the third-party vendor that they must come to the worksite and conduct drug testing. *Id.* at 118 (Page ID #1344). Moore's results came back positive for cannabinoids, at a level of 25 ng per milliliter, *id.* at 110–11 (Page ID #1336–37), which is below CCBC's 50 ng per milliliter threshold, R. 76-8 (CCBC Drug & Alcohol Abuse Policy at 6) (Page ID #2560).

On April 11, 2017, Moore signed an SCA with CCBC, with Boland signing for CCBC. R. 69 (Boland Dep. at 96) (Page ID #1322).[1] The SCA required Moore to "undergo random drug testing for 24 months[] after he sign[ed] it." *Id.* at 96–97 (Page ID #1322–23). Although Boland was the individual who signed the SCA on CCBC's behalf, he had not personally reviewed Moore's drug-test results but relied on what the supervisors had told him. *Id.* at 99 (Page ID #1325). Moore did not believe that he should have had to sign the SCA, because he had only 25 ng per milliliter in his system. R. 67 (Moore Dep. at 133) (Page ID #717). Boland told Moore that "if they said you failed it, you failed it," and that Moore could either sign the SCA or lose his job with CCBC, so Moore signed the SCA. *Id.* Moore stated that he tried to submit a grievance after the fact but was told he could "only grieve the instance of the accident happening and not what happened after the accident," *id.* at 134 (Page ID #718), which Moore did not know at the time he signed the SCA, *id.* at 136–37 (Page ID #720–21). Randy Verst ("Verst"), who was the union president, later told Moore that he "shouldn't have signed [the SCA] without talking to him." *Id.* at 139–40 (Page ID #723–24).

Once Moore was "aware [he] would be placed on second chance," he was directed to Coca-Cola's Drug and Alcohol Policy, which was "posted [on] one of the bulletin boards." *Id.* at 87–88 (Page ID #671–72). Before he was directed to the bulletin board, Moore was unaware of

---

[1]According to Boland, the policy of permitting workers who fail a drug test to sign an SCA and return to work is not part of the union's CBA but is a "written understanding between Coke and [Local 1199]." R. 69 (Boland Dep. at 101–02) (Page ID #1327–28).

the posting. *Id.* at 88–90 (Page ID #672–74). Moore stated that he would not consider the posting public, because if an employee did not work on the mezzanine, they were unlikely to be familiar with the bulletin board and because a piece of paper had been posted on top of part of the policy. *Id.* Per the SCA, employees who violate its terms or CCBC's Drug and Alcohol Abuse Policy can be "terminated from [their] job without recourse[.]" R. 76-8 (CCBC Drug & Alcohol Abuse Policy at 8) (Page ID #2562). Moore's understanding was that it was up to "manager's discretion to fire who [they] felt deserved to be fired." R. 67 (Moore Dep. at 140) (Page ID #724).

On June 21, 2017, Moore attended a pre-shift meeting, which his team had before every shift and which "were[] typically[] r[u]n by managers." *Id.* at 97 (Page ID #681). At the meeting, one of the managers, Anthony Cundiff ("Cundiff"), "[told] the team that [they] could no longer stage [their] product outside the warehouse" to speed them up, because it was "a food safety issue." *Id.* at 98 (Page ID #682). Several of the employees at the meeting took issue with this and Moore heard "a lot of people . . . [say] this is BS, F that, or whatever." *Id.* Another employee called it "bullshit," to which Cundiff responded that he "kn[e]w it[] [was] bullshit . . . but you have to do it." *Id.* at 98–99 (Page ID #682–83). After the managers and employees went back and forth on the announced policy for a few minutes, Moore intervened and said "F it, if they want you to slow down, slow the hell down and let's get back to work." *Id.* at 99 (Page ID #683). The discussion died down after Moore spoke up, and people went back to their shifts. *Id.* at 100 (Page ID #684).

Later that day, Karen Daniels, another CCBC supervisor, approached Moore and told him that other managers were accusing him of attempting to instigate a work stoppage. *Id.* Moore then met with managers Cundiff, Boland, Michelle Couch, Darryl Taylor, and Chris Chaney; they told him he was "being let go for stopping the build." *Id.* Moore later found out that he was fired for insubordination and "saying the four letter word in a meeting." *Id.* at 106, 109 (Page ID #690, 693). Moore claims that he heard other people cursing during the meeting, including Dave Hall, Glen Smith, Kenny McGuire, David Shavers, Kenny Cunningham, Brian Crooks, Andrew McIntire, Larry Voss ("Voss"), Lonnie Walters, Leavell Adams, Ronshayla Newby, Michael

Chenault, Jonathan Desnoyer, and Russell Mundy, all of whom "were in [Moore's] direct vicinity," in which "everybody was just shouting profanities." *Id.* at 103–04 (Page ID #687–88).

After Moore was terminated on June 17, 2017, the union and CCBC negotiated to bring him back if he agreed to sign an LCA, R. 69 (Boland Dep. at 69–70) (Page ID #1295–96), which Moore signed on July 14, 2017, R 67 (Moore Dep. at 123) (Page ID #707). The union requesting an LCA was "very unusual" because they "never ever took [LCAs]." R. 69 (Boland Dep. at 90) (Page ID #1316). Before executing the agreement, which would be in effect for twelve months, Moore spoke with Boland and Arrington, the union's vice president. R. 67 (Moore Dep. at 124–25) (Page ID #708–09). Moore has stated that no one was in the room when he signed the LCA other than himself, Arrington, and Boland. *Id.* at 125 (Page ID #709). According to Moore, the whole meeting took ten minutes, only two of those minutes were dedicated to discussing the LCA, and Arrington's "whole thing was, just sign it and get back to work. It's better to fight with a job than fight without a job." *Id.* Part of the LCA stated that Moore agreed to "release[] and forever discharge[] the Company and the Union . . . from any and all liability of any kind whatsoever, relating to his employment with the [c]ompany, arising prior to the date of [the LCA.]" R. 76-6 (LCA) (Page ID #2545).

Moore did not feel that his signing the LCA was voluntary because he "was in dire need of getting [his] job back." R. 67 (Moore Dep. at 127) (Page ID #711). He also stated that he made the decision to sign the LCA only because of his "unfortunate circumstances created by [] Boland," who he asserted "fired [Moore] without just cause . . . [and] eliminated [Moore's] overtime." *Id.* at 128 (Page ID #712). Although Moore stated that he verbalized his "feelings [that] this contract was unjust," his objection is not written in the agreement. *Id.* at 129 (Page ID #713). He also stated that he was under the impression that he would be able to grieve his signing the SCA and the events that led up to him doing so. *Id.* at 137 (Page ID #721). Boland informed Moore that Moore would be able to grieve only the accident, not the "incident itself." *Id.* at 136 (Page ID #720).

After Moore signed the SCA and LCA, he was randomly drug tested six times. *Id.* at 149 (Page ID #733). On July 12, 2018, Moore submitted a positive test for cannabinoids. *Id.* at 151 (Page ID #735). This time, the concentration was "greater than 300 [ng] per milliliter," which is

above the CCBC Drug and Alcohol Abuse Policy's 50 ng per milliliter threshold. *Id.* at 152 (Page ID #736). Moore was officially terminated on July 31, 2018. *Id.* at 164 (Page ID #748). Although Moore does not contest that on July 12 he tested above the threshold, he stated that he should not have been subject to the random drug testing in the first place, because he did not fail the first drug test when he tested positive for only 25 ng per milliliter of cannabinoids. *Id.* at 152–53 (Page ID #736–37).

Starting in August 2016, Moore had been submitting claims of discrimination to CCBC's human-resources department. *Id.* at 232–33 (Page ID #816–17). Moore complained about several incidents, including one in February 2017, when Moore was suspended for three days without pay for insubordination. *Id.* at 111–13, 233 (Page ID #695–97, 817). After Moore returned from his February 2017 suspension, he filed a grievance and received backpay for two of the three days but claimed that Boland withheld the final day's pay to "teach [Moore] a lesson." *Id.* at 114–15 (Page ID #698–99). Moore also stated that Boland told him to stop calling HR with his discrimination complaints. *Id.* at 233 (Page ID #817). After Moore was drug tested and cited for insubordination, he took his discrimination complaints "straight to the Ohio Civil Rights Commission [OCRC]" in July 2017. *Id.* at 233–34 (Page ID #817–18). Moore stated that he was denied backpay from the time between when he was terminated and brought back, whereas he "knew of several white guys that were getting their backpay from insubordination cases." *Id.* at 264 (Page ID #848). Part of Moore's racial-discrimination claim in federal court is that he was retaliated against for making these complaints about discrimination in the workplace.

On July 18, 2017, after Moore signed the LCA, he submitted a Charge of Employment Discrimination with the OCRC. R. 70-21 (OCRC First Charge) (Page ID #2151). In his First Charge, Moore claimed that the actions leading to his being placed on the LCA (insubordination and inappropriate language) were the results of racial discrimination, because white employees had used similar language but were not likewise penalized. *Id.* Nearly two years later, on May 24, 2019, Moore filed a second claim with the EEOC, asserting that CCBC had racially discriminated and retaliated against him by penalizing him for actions that similarly situated white employees also committed without discipline. R. 37 (Am. Compl. at 11) (Page ID #143).

Moore stated in his deposition that CCBC does not "ha[ve] an interest in having employees who are not consuming drugs or alcohol," because there was "obvious drug use on the grounds on lunch breaks." R. 67 (Moore Dep. at 91) (Page ID #675). He claimed that managers had not exercised their discretion to fire other people who tested positive, like another employee, John Wermeling ("Wermeling"), who came "in[to work] drunk and high every[]day." *Id.* at 157 (Page ID #741). In one incident, Wermeling passed out at work and was taken by ambulance to the hospital. R. 79-12 (Wermeling Incident Email at 1) (Page ID #2977). Wermeling was apparently stumbling around and smelled of alcohol prior to losing consciousness. *Id.* Despite Wermeling's actions, CCBC managers and supervisors did not take disciplinary measures against him. R. 79-9 (Adams Decl. at 4) (Page ID #2965). Another Black employee, Leavell Adams ("Adams"), stated that he has had accidents at both CCBC's Duck Creek and Erlanger, Kentucky locations and has been subjected to a drug and alcohol test after each accident. *Id.* at 4–5 (Page ID #2965–66). Adams claimed that a white employee, Paul Minland, "was involved in two accidents at work, but [CCBC] didn't require him to take a mandatory drug and alcohol test." *Id.* at 5 (Page ID #2966). On June 5, 2015, another white employee, Voss, was placed on an SCA that, like Moore's, subjected Voss to twenty-four months of random drug testing. R. 72-5 (Hadam Decl. at 1) (Page ID #2240). Voss tested positive after a post-accident drug test in May 2017, R. 79-11 (Drug Test Results) (Page ID #2976), but remained a CCBC employee until October 3, 2018, when CCBC terminated Voss for failing a September 2018 random drug test, R. 72-5 (Hadam Decl. at 2) (Page ID #2241).

After Moore filed his complaint, CCBC moved for summary judgment, which the district court granted. The district court found that Moore had waived his pre-LCA claims when he signed the LCA. *Moore v. Coca Cola Bottling Co. Consol.*, No. 1:18-cv-486, 2023 WL 5647825, at *4 (S.D. Ohio Aug. 31, 2023). Because the district court found that Moore "knowingly and voluntarily" entered the LCA, it considered only his claims from July 14, 2017, to July 31, 2018. *Id.* The district court presumed that Moore had made out a prima facie case for racial discrimination and retaliation, *id.* at *5, but found that Moore had failed to establish that CCBC's proffered reasons for terminating Moore were pretextual, *id.* at *6.

## II. DISCUSSION

### A. Standard of Review

"We review de novo a district court's grant of summary judgment." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). At this stage, we must "view the evidence in the light most favorable to the non-movant and resolve all factual disputes in his favor." *Id.* Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. Moore's Pre-LCA Claims

#### 1. Voluntary Waiver

Moore claims on appeal that the district court erred in finding that he had voluntarily waived "all claims of racial discrimination or retaliation regarding situations or circumstances that occurred before" Moore signed the July 2017 LCA. *Moore*, 2023 WL 5647825, at *4; Appellant Br. at 16. In light of the factors relevant to determining whether an employee voluntarily waived their Title VII rights, we conclude that Moore has demonstrated that there exists a genuine dispute of material fact regarding whether he involuntarily waived his pre-LCA rights. We therefore REVERSE the district court's finding that it could not consider Moore's discrimination and retaliation claims that preceded his signing the LCA and REMAND for proceedings consistent with our opinion.

"We have recognized that under particular circumstances employers and employees may negotiate a valid release of . . . Title VII claims." *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995). Determining whether an employee's waiver of their rights was valid is a question of federal common law, *McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 302–03 (6th Cir. 2018), and we "appl[y] ordinary contract principles in determining whether such a waiver [was] valid," *Adams*, 67 F.3d at 583. In reaching a conclusion about whether such a waiver was valid, we consider: "(1) [the] plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver;

(4) consideration for the waiver; as well as (5) the totality of the circumstances." *Id.* While weighing these factors, we also "must 'remain[] alert to ensure that employers do not defeat the policies of . . . Title VII by taking advantage of their superior bargaining position.'" *McClellan*, 900 F.3d at 303 (quoting *Adams*, 67 F.3d at 583).

In finding that Moore had voluntarily waived his rights in the July 2017 LCA, the district court relied on the fact that: (1) Moore possessed both an associate's degree in fashion merchandising and a bachelor's degree in health-care administration; (2) "[n]othing in the record suggest[ed] that Moore had to sign the LCA" on the day it was provided to him or that Moore had requested additional time to review the LCA; (3) nothing in the record suggested that Moore could not consult with a lawyer before signing the LCA; (4) Arrington, the union's vice president, "was in the room when Moore signed" the LCA; (5) "the release [was] clear and unambiguous"; and (6) sufficient consideration supported the LCA. *Moore*, 2023 WL 5647825, at *3–4. The district court also rejected Moore's argument that he had signed the LCA under economic duress, reasoning that the economic pressures that accompany any bargaining do not amount to economic duress. *Id.* at *4.

The waiver factors, taken as a whole and in the context of Moore's particular situation, show that there is a genuine dispute of material fact over whether Moore voluntarily waived his preexisting discrimination and retaliation claims by signing the July 2017 LCA. Moore has stated that the entire meeting in which he signed the LCA lasted ten minutes, R. 67 (Moore Dep. at 125) (Page ID #709), with only two of those ten minutes dedicated to discussing the LCA, *id.* It is unclear from the record whether Moore was required to sign the LCA the same day that he was presented with it, or if he was able to request additional time to consider the contract's terms. Similarly, the record indicates that Moore did not have an attorney present but does not provide any information as to whether Moore would have been permitted to request one prior to his signing the LCA. Most telling is that Arrington, the union representative in the room with Moore when he signed the LCA, told Moore to just sign the LCA and that it was "better to fight with a job than fight without a job." R. 67 (Moore Dep. at 127) (Page ID #711). Reasonable jurors could find that Arrington's statements indicated that Moore's discrimination claims would survive his signing the LCA and that they influenced Moore's signing the agreement.

Although Moore holds associate's and bachelor's degrees, his education does not provide him with any type of legal, managerial, or contractual background that would be relevant to interpreting the LCA's terms in a manner essentially at odds with what the union representative told Moore. *Cf. Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 974 (6th Cir. 2007); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003) (en banc). Nor does it appear from the record that Moore had any previous experience with this type of agreement during his time with CCBC or elsewhere. The district court relied exclusively on our unpublished case *Hank v. Great Lakes Construction Co.*, in determining that Moore did not need "to have any legal education or experience to find that a release was entered into voluntarily," *Moore*, 2023 WL 5467825, at *3. However, in our previous published cases finding voluntary waiver, we have generally emphasized that the individuals possessed education and experience that was relevant to their ability to comprehend the terms of the agreements they have signed, especially when the agreement was otherwise unclear or ambiguous. *Cf. Seawright*, 507 F.3d at 974 (noting that the plaintiff was "an educated, managerial employee"); *Morrison*, 317 F.3d at 668 (same). By contrast, a reasonable juror could find that Moore's fashion merchandising and health-care administration degrees did not provide him with sufficient education or experience to understand that he was specifically waiving his rights to bring past discrimination and retaliation claims by signing the opaque LCA in light of contrary assertions by the union representative and in the full context of the signing of the agreement.

The district court found that the LCA's terms were sufficiently clear and unambiguous as to Moore's discrimination and retaliation claims. *Moore*, 2023 WL 5647825, at *4. In relevant part, the LCA states that "Moore releases and forever discharges the Company and the Union . . . from any and all liability of any kind whatsoever, relating to his employment with the Company, arising prior to the date of this Agreement[.]" R. 76-6 (LCA) (Page ID #2545). We conclude that there exists a genuine dispute over whether the LCA's terms were sufficiently unambiguous. In other cases where we have found that such provisions are straightforward in their terms, the contracts have explicitly stated that the employee was waiving the right to bring a discrimination suit, *Seawright*, 507 F.3d at 974, or that an individual must "arbitrate any legal dispute relating to their employment . . . , including all state and federal statutory claims," *Morrison*, 317 F.3d at 654. The LCA that Moore signed is not precise in explaining what was meant by "any and all

liability of any kind whatsoever relating to his employment with" CCBC, and Moore lacks a background that would help him to interpret this term.  Most important in Moore's case is Arrington's statement in the context of signing the LCA that it was "better to fight with a job than fight without a job."  R. 67 (Moore Dep. at 127) (Page ID #711).

The dissenting opinion has a different view of Moore's waiver.  But the dissenting opinion misunderstands the inquiry that we must undertake.  For one, the dissenting opinion spends nearly its entire waiver analysis focused on Moore's educational background, despite acknowledging that "the signor's experience, background, and education" form just one consideration in a totality-of-the-circumstances test.  Dissenting Op. at 32.  We may disagree over whether Moore's background cuts in favor of or against a finding of knowing and intentional waiver, but regardless, it is only one consideration.  As discussed above, particularly important in this case are the facts that (1) the union representative effectively suggested that Moore would be able to seek legal recourse notwithstanding Moore's signing of the agreement; (2) the agreement was not clear with respect to what rights Moore was waiving; and (3) CCBC was in a better bargaining position.[2]  In other words, consistent with our caselaw, Moore's education and experience are not "dispositive," but rather are considered in the full context of the other waiver factors.  *Contra id.* at 34.  Indeed, the union representative's comments alone suggest that the waiver was not likely knowing and voluntary: it is natural for an employee to trust that their representative's representations concerning that employee's rights are fair and accurate.  This would be true whether Moore was extremely well-educated or not educated at all.

Setting these points to the side, the dissenting opinion is also mistaken that Moore's background and experience unambiguously support a finding of knowing and voluntary waiver and that fact issues do not exist on this point.  Without a doubt, our circuit has not spoken with

---

[2]The dissenting opinion suggests that we are misreading precedent related to educational background, but in the same breath the dissenting opinion casts doubt on binding circuit precedent that plainly states that we must consider the waiver analysis in the context of the superior bargaining position of employers.  Dissenting Op. at 32 n.4.  Notwithstanding the dissenting opinion's incorrect simplification of contract principles, our waiver analysis in this case concerns civil-rights claims under federal *statutory* law.  There is good reason to guard against the hollowing out of those rights specifically conferred on employees by statute.  *See, e.g.*, *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995).  This has been the law of the circuit for decades.  That "[m]ere inequality in bargaining power" is not a reason to invalidate a knowing and voluntary waiver *does not mean* we can blind ourselves to objective reality or that we cannot consider the parties' relative positions as part of our analysis.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991).

perfect consistency about exactly how education and background ought to factor into the waiver calculus, as the caselaw relied on by the dissenting opinion shows. *See, e.g.*, *Soltis v. J.C. Penney Corp.*, 635 F. App'x 245, 250 (6th Cir. 2015) ("We have found a waiver to be knowing and intelligent where an employee took post-graduate courses, was a managerial employee, had twenty-one days to review the agreement and seven days thereafter to change her mind, and consulted a divorce attorney before signing the agreement" but not "where the employees were educated and did not indicate they did not understand the waiver, but were not informed of their right to revoke the waiver and were not given documentation about the procedures to be used in place of judicial proceedings until after they began their employment"). Put differently, contrary to the dissenting opinion's apparent view, there are no hard-and-fast rules for whose background and education suggests a knowing and voluntary waiver and whose does not. And inquiring into Moore's level of education and type of education does not turn the objective waiver test into a subjective one. Dissenting Op. at 33–35 & n.6. Our waiver inquiry has always had both objective and subjective elements: we ask whether a reasonable person (objective) would have understood that they were waiving their rights based on a number of factors particular to the employee at issue (subjective). Overall, this remains an objective test—indeed, the look at Moore's education and background is the exact inquiry done by any and all of our waiver cases. *See id.* at 34 ("Our precedent requires that we consider whether the signor's 'experience, background and education' generally indicate whether the signor entered the waiver knowingly and voluntarily while considering the other factors.").

Properly understood, the background and education factor principally considers how a person's experience would help or hinder them in understanding the contract at issue. For example, the clearer the waiver or the more assistance a person receives in understanding an agreement, the less significant is any particular experience or background to finding knowing and voluntary waiver. *See, e.g.*, *Tillman v. Macy's, Inc.*, 735 F.3d 453, 461 (6th Cir. 2013) (plaintiff's high-school-level education supported finding knowing and voluntary waiver when the waiver was written in "understandable terms"); *Sako v. Ohio Dep't of Admin. Servs.*, 278 F. App'x 514, 518 (6th Cir. 2008) (per curiam) (less education and experience necessary to understand waiver in context of document that was "brief and could easily be read and understood" and when plaintiff was "assisted throughout by union officials" (internal quotation

marks omitted)).   In the context of this case and for all of the reasons discussed above, a reasonable juror could find that Moore's education and background would have hindered him from understanding the full scope of the rights that he was waiving.[3]   At a minimum, a reasonable juror could find that Moore's background and experience does not *support* a finding of knowing and voluntary waiver.

We must consider the totality of the circumstances in determining the voluntariness of Moore's waiving his rights by signing the LCA.   Although Moore holds bachelor's and associate's degrees in unrelated fields, neither of them would provide him with any type or level of expertise concerning how LCAs work.   That is especially true here, given that  Arrington, the union's vice president and the only union representation present with Moore during his brief meeting about the LCA, suggested that Moore would still be able to pursue his claims after he signed the LCA.   Taking into account all of the factors, there exists a genuine dispute of material fact over the voluntariness of Moore's waiver, particularly given the fact that Moore had been explicitly told by the sole union representative with him in the room to sign the LCA and that it was better to fight with a job.   Considering all relevant factors alongside our duty to account for CCBC's relatively "superior bargaining position," *McClellan*, 900 F.3d at 303, we REVERSE the district court's finding that Moore voluntarily waived his Title VII claims by signing the LCA and REMAND for proceedings consistent with our opinion.

### 2.  Failure to Exhaust

CCBC also claims on appeal that even if Moore involuntarily waived his pre-LCA claims, those claims are nevertheless barred because Moore "did not exhaust his administrative remedies by addressing them in his First Charge [to the EEOC]."  Appellee Br. at 17.  Moore contends that "[t]he crux of [his] claims for what happened prior to him signing the LCA on July 14, 2017, is, and has always been," his July 6, 2017 termination for alleged insubordination. Appellant Reply Br. at 3.  He states that this claim, which is addressed in his first EEO complaint, "has nothing to do with" the SCA, which is related to his claims of race

---

[3]It is hardly necessary to engage with the dissenting opinion's parade of horribles, Dissenting Op. at 33 n.5, which is entirely divorced from the facts of this case and has nothing to do with whether a reasonable person who was similarly situated to Moore would have understood that they were waiving their rights.

discrimination and retaliation that culminated in his termination on July 31, 2018, and that were addressed in his second EEO complaint, submitted in May 2019. *Id.* at 3–4.

Individuals who bring Title VII discrimination claims in federal court must exhaust their administrative requirements first. *See Williams v. CSX Transp. Co.*, 643 F.3d 502, 507–08 (6th Cir. 2011) (citing 42 U.S.C. § 2000e-5(e)). Failure to exhaust in the context of Title VII claims is an affirmative defense that defendants "bear[] the burden of pleading and proving." *Lockett v. Potter*, 259 F. App'x 784, 786 (6th Cir. 2008); *see also Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009); *cf. Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). In their motion for summary judgment before the district court, CCBC did not argue that Moore had failed to exhaust his administrative remedies before the EEOC. *See generally* R. 72-1 (Mem. in Supp. Def.'s Mot. for Summ. J.). Although CCBC now encourages us to uphold the district court's ruling on the ground that Moore failed to exhaust administrative remedies with regards to his pre-LCA claims, Appellee Br. at 17–19, we hold that CCBC has forfeited this affirmative defense by failing to raise it in the district court below.

**C. Disparate-Treatment Claim**

Moore claims that CCBC discriminated against him on the basis of race when it ultimately fired him for a positive drug test. He does not identify any direct evidence of racial discrimination but argues that CCBC had "singled out and targeted [Moore]" while treating white employees more favorably. Appellant Br. at 22. CCBC argues that the actions of Voss and Wermeling, the two employees Moore asserts were similarly situated to him, were insufficiently comparable to Moore's own situation. Appellee Br. at 27–31. We hold that Moore has raised a genuine issue of material fact regarding his disparate-treatment claim, and that the district court therefore erred in granting summary judgment to CCBC on this ground.

When plaintiffs do not support their claims with direct evidence of racial discrimination, we use the "*McDonnell Douglas* burden-shifting approach" to evaluate their allegations. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). The plaintiff must sufficiently show "that he [] suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.* (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*,

484 F.3d 357, 365 (6th Cir. 2007)). To make out this prima facie case, the plaintiff must "show that he was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016). The district court below assumed that Moore had made out his prima facie case of racial discrimination. *Moore*, 2023 WL 5647825, at *5.

On appeal, CCBC "does not contest the district court's analysis" with respect to its assumption that Moore had established a prima facie case for his discrimination and retaliation claims. Appellee Br. at 19–20. We conclude that Moore has met the "not onerous" burden of establishing his prima facie case of discrimination. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). The parties do not dispute that Moore is Black, was terminated from his position at CCBC, and was qualified for his position.[4] On appeal, Moore focuses on the fourth prong of our prima facie analysis and argues that he was treated differently than similarly situated white employees with regards to CCBC's drug-testing policy. Appellant Br. at 17–20. Moore points to Voss and Wermeling specifically, arguing that Voss had also failed a drug test while subject to an SCA but was not terminated until he failed a second drug test and that Wermeling had not been tested for drugs and/or alcohol after a workplace accident. *Id.* at 19–20. We conclude that Moore has sufficiently made out a prima facie case of discrimination.

Under the *McDonnell Douglas* framework, the burden shifts to CCBC to proffer a nondiscriminatory reason for its actions. *Clay*, 501 F.3d at 703. In order to meet this burden,

---

[4]Oddly, the dissenting opinion opens by suggesting that we are treating random drug testing as an "adverse employment action." Dissenting Op. at 24. Of course, the dissenting opinion points to nothing in our opinion that states as much. Nothing in our analysis depends on treating the drug tests that Moore was required to take as "adverse employment actions"; indeed, we *all* agree that Moore was fired twice and that termination is a quintessential adverse employment action. Perhaps the dissenting opinion is confused about the relevance of the drug testing with respect to establishing pretext on the part of CCBC and to show that Moore was treated differently from similarly situated comparators. *See, e.g.*, *Carter v. Bowman*, 172 F. App'x 915, 918 (11th Cir. 2006) (per curiam) ("[The plaintiff] belongs to a protected class and he was subjected to an adverse employment action when he was terminated. As to the third prong [of the prima facie case], [the plaintiff] must establish that [the employer] treated similarly-situated white employees more favorably. Viewing the facts most favorable to [the plaintiff], a reasonable person could find there were three employees who were injured on-the-job, who reported the injury soon thereafter, and were not required or asked to take a drug test."). Regardless, as discussed, Voss and Moore engaged in substantially similar conduct—a failed drug test while on SCAs—and were treated differently—Voss suffered no consequences, whereas Moore was fired. This is a classic case of disparate treatment and does not require breaking new ground.

CCBC "'must clearly set forth . . . the reasons' for its decision[s]." *Id.* (quoting *Tex. Dep't of Cmty. Affs.*, 450 U.S. at 255). On appeal, CCBC argues that it has a legitimate, nondiscriminatory reason for each of the actions that it took against Moore. CCBC states that it administered a drug test to Moore in March 2017 because corporate policy dictated that it administer a drug test after every accident in the warehouse and points out that it continued to employ Moore after he signed the SCA. Appellee Br. at 20–21. CCBC states that its later decision in 2017 to terminate Moore happened after Moore stated "F*** it, if they want you to slow down, slow the hell down" in a meeting, which CCBC viewed as insubordinate. *Id.* at 21. The periodic drug testing that Moore underwent "throughout his employment" was based on Moore's signing the SCA, which included a 24-month random-drug-testing period as one of the conditions of Moore's continued employment. *Id.* Finally, CCBC states that it terminated Moore in 2018 because he tested "above the cannabinoid threshold level" in one of those mandatory random drug tests. *Id.*

If CCBC articulates a legitimate and nondiscriminatory reason for its actions, we shift the burden back to Moore "to show that the reason[s] put forth by the defendant [are] pretextual." *Clay*, 501 F.3d at 704. Moore can do so by demonstrating "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)). At the summary-judgment stage, showing that a proffered reason is insufficient requires the employee to show that a "reasonable factfinder could find that [the employer's] proffered reason was insufficient to motivate [the employee's] discharge." *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008). Moore can demonstrate this by showing that "other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).

The district court found that CCBC's proffered reasons for its actions against Moore were legitimate and non-discriminatory, although it did not consider any of Moore's pre-LCA claims. The district court found that CCBC's "proffered reason for terminating Moore in July 2018" was "based in fact," because Moore had failed a drug test and violated his SCA. *Moore*, 2023 WL 5647825, at *6. In reaching the conclusion that Moore had not sufficiently established pretext, the district court stated that "nothing in the record suggest[ed] that" Moore's failed drug test "did not actually motivate" his termination, and that "the failed drug test was sufficient to terminate Moore." *Id.*

On appeal, Moore argues that there exists a genuine dispute of material fact as to whether he was singled out for random drug testing and treated differently than similarly situated white employees were. Appellant Br. at 22. Moore first contends that CCBC's explanations are not based in fact, because he never failed his first drug test in March 2017 and because he "was specifically targeted for drug testing on July 12, 2018." Appellant Br. at 26. To support his claim that he was targeted, Moore alleges that he "was the only employee drug tested all six times that he was supposedly given a random drug test under his SCA." *Id.* at 27. Moore then argues that his SCA and subsequent positive drug test did not motivate his termination, because other employees like Voss and Wermeling were permitted to come to work under the influence of alcohol or drugs and were not likewise penalized. *Id.* at 27–29.

Because there exists a genuine dispute of material fact regarding whether Moore voluntarily waived his pre-LCA claims, we REMAND to the district court for further proceedings on Moore's claim that his March 2017 drug test had no basis in fact. We also REVERSE the district court's conclusion that Moore has not demonstrated pretext with regards to his post-LCA claims, and REMAND for proceedings consistent with this opinion. Moore has shown enough with regards to CCBC's actions after he signed the LCA that a reasonable factfinder could find that CCBC engaged in racial discrimination. CCBC claims that it terminated Moore because he tested positive for marijuana while he was subject to the SCA's terms, which stated that an employee who fails a random drug test like Moore's may be immediately terminated for doing so. Appellee Br. at 21. Moore claims that Voss was likewise on an SCA, but was not tested during this time, nor was Voss fired after he had a positive drug

test while on an SCA.[5]  Voss was subject to his SCA terms from June 5, 2015, through June 5, 2017, for a total of twenty-four months.  R. 72-5 (Voss SCA) (Page ID #2244–45).  On May 15, 2017, Voss posted a positive result when he was given a post-accident drug test.  R. 79-11 (Drug Test Results) (Page ID #2976).  However, based on the available record, it does not appear that Voss was terminated (or even forced to sign an LCA) in the aftermath of this positive drug test.  Voss was ultimately terminated on October 3, 2018, after he failed another, random drug test.  R. 72-5 (Hadam Decl. at 10) (Page ID #2249).[6]  CCBC argues that Voss's post-accident drug test was not "substantially identical conduct" to Moore's failing a random drug test in 2018, because the impetus for the drug testing was different for each man.  Appellee Br. at 29.  We view both employees submitting positive drug tests while subject to an SCA to be sufficiently similar conduct to create a genuine issue of material fact.

The dissenting opinion's attempts to brush aside the disparate treatment as between Moore and Voss are unpersuasive.  The dissenting opinion concedes that Voss is a fair comparator, so if Voss was in fact treated differently based on similar conduct then Moore has at a minimum raised fact issues concerning pretext.  Dissenting Op. at 29 ("To be sure, Voss is similarly situated to Moore.").  Unfortunately, the dissenting opinion then contorts the analysis in order to avoid the obvious conclusion that Moore showed disparate treatment based on the lack of discipline Voss faced after failing a drug test while under an SCA.  The dissenting opinion declares that because Voss was *eventually* disciplined for failing a *second* drug test, Moore cannot show pretext.  *Id.*  This is, frankly, a misunderstanding of the law.  Voss and Moore both

---

[5]At every juncture, the dissenting opinion casts doubt on the evidence of disparate treatment that Moore has offered, including evidence concerning the different treatment as between Voss and Moore.  This case comes to us on summary judgment, however, and given that CCBC moved for summary judgment in the district court, we are compelled to construe the record in the light most favorable to Moore.  The dissenting opinion wrongly flips this burden onto Moore.  By way of an example, the dissenting opinion blindly accepts that Voss was drug tested four times pursuant to his SCA.  Yet a listing of the drug tests done by CCBC shows that Voss was not randomly drug tested during the entire two-year span in which his SCA was in effect—June 5, 2015, to June 5, 2017.  R. 79-11 (Drug Test Results) (Page ID #2976).  At this stage of the proceeding, we would call this a dispute of material fact.  It is not our place to resolve such disputes, despite the dissenting opinion's views of the record.  *See also, e.g.*, Dissenting Op. at 26 ("Moore has not proffered evidence suggesting that this mistaken placement [on an SCA] was anything other than a mistake.").

[6]Voss's termination letter states that Voss's SCA was signed on June 5, 2018.  R. 72-5 (Hadam Decl. at 10) (Page ID #2249).  However, the signed SCA is dated June 5, 2015, and there is no indication in the record that Voss was subjected to another SCA after the one he signed in 2015.  *See* R. 72-5 (Hadam Decl. ¶ 3) (Page ID #2240–41); R. 72-5 (Voss SCA) (Page ID #2244–45).

engaged in substantially similar conduct—failed drug tests while on SCAs—and yet Moore was fired immediately whereas Voss was allowed to keep his job for nearly eighteen more months and until he failed a second drug test. To state the facts is effectively to show different treatment despite identical conduct. A two-strikes policy for firing Black employees and a three-strikes policy for firing white employees would plainly constitute disparate treatment and raise pretext concerns. At this stage, all that we look for is similarly situated comparators who "were not fired" despite engaging in "substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779–80 (6th Cir. 2016) (citation omitted). Voss clearly provides that comparison to Moore.[7]

Moore also points to Wermeling, who, like Moore, had a workplace accident involving an AGV. R. 79-12 (Wermeling Incident Email at 1) (Page ID #2977). According to eyewitnesses, Wermeling had been stumbling around and smelled of alcohol prior to his passing out in the warehouse. *Id.* CCBC policy dictates that even when an employee's accident mandated medical care, as Wermeling's did, they still must be drug and alcohol tested. *See* R. 69 (Boland Dep. at 116–17) (Page ID #1342–43). Moore alleges that CCBC never drug tested Wermeling, nor did they take any disciplinary measures against him. R. 79-9 (Adams Decl. at 4) (Page ID #2965).

Although Moore and Wermeling are not "identical in every way," our circuit has never required that a plaintiff make such a showing to establish a fair comparator, contrary to the dissenting opinion's view. *Tennial*, 840 F.3d at 304. The record shows that (1) Wermeling and Moore were both forklift drivers; (2) both employees were involved in accidents involving AGVs, which were considered workplace incidents; and (3) both men should have been drug and alcohol tested, per company policy.[8] *See, e.g.*, *Jackson*, 814 F.3d at 782–83 (explaining that

---

[7]No amount of inferential reasoning is required to support this analysis, contrary to the dissenting opinion's views. Dissenting Op. at 29. The dissenting opinion's take that Voss not being fired despite failing a drug test under an SCA is "immaterial to our Title VII analysis" is nothing more than *ipse dixit*.

[8]The dissenting opinion states that "the majority decides for itself that Wermeling *should have been* drug tested" and that "the majority's Wermeling-should-have-been-drug-tested decision is evidence that Wermeling is similarly situated to Moore." Dissenting Op. at 30. These statements suggest that we somehow injected our own judgment into this case, when in fact the record amply demonstrates that a reasonable juror could find that

there is no requirement "that a plaintiff and her comparator must commit exactly the same mistake in order to permit a reasonable inference of intentional discrimination from their differential discipline" and that "infractions substantially identical in terms of severity of potential consequences" and "substantially identical" in terms of "the circumstances of the mistakes themselves" allow for fair comparison).  If anything, Wermeling's conduct was *more serious* than that which gave rise to Moore's SCA: Wermeling was seriously injured due to his passing out in the AGV's path and the incident caused a halt in production.  R. 79-8 (Ervin Decl. ¶¶ 20–23) (Page ID #2958–59).  And although the dissenting opinion states that "Moore has put on little evidence about Wermeling other than some speculation that he was a supposed alcoholic in the warehouse," Dissenting Op. at 30, the record evidence demonstrates otherwise, *see, e.g.*, R. 79-12 (Wermeling Incident Email at 1) (Page ID #2977) (internal company email about accident stating "it has been said [Wermeling] was stumbling around prior to this and smelled of alcohol"); R. 79-8 (Ervin Decl. ¶ 7) (Page ID #2956) ("I frequently observed Werm[eling] coming to work drunk and under the influence of alcohol.  It was common knowledge in the warehouse amongst the employees, managers and supervisors that Werm[eling] had a drinking problem.").

All told, the record evidence at least raises fact issues that Wermeling, who was similarly situated to Moore with respect to both job duties and with respect to a workplace accident, was treated differently than Moore.  Wermeling was not drug or alcohol tested when he should have been, whereas Moore was.  This was in spite of Wermeling engaging in chronic misconduct and being involved in a more significant accident.  This is far different than simply concluding that Wermeling "work[ed] at the same company as [Moore] and ha[d] a different work experience." Dissenting Op. at 30.  We hold that there exists a genuine issue of material fact as to whether Moore and Wermeling were treated differently while engaging in similar conduct.

---

Wermeling and Moore were treated differently.  As to the former, the record indisputably shows that Wermeling should have been drug tested.  R. 79-12 (Wermeling Incident Email at 3) (Page ID #2979) (internal company email with subject line "Did you ask to have John Wermeling drug/alcohol tested?" and response "No.  I sent Russ an e-mail on Thursday letting him know [] [t]hat he needs [to be] drug tested.").  And as to the latter, there are myriad issues of fact associated with CCBC's knowledge of Wermeling's alcohol problems, as discussed in our opinion.  That the dissenting opinion decides for itself which facts it accepts and which facts it discounts at this juncture shows that it is usurping the jury's proper role.

At this stage in Moore's case, we hold that he has sufficiently shown that there is a genuine dispute of material fact as to whether CCBC treated Moore less favorably than similarly situated white employees, and REVERSE and REMAND the district court's granting CCBC's motion for summary judgment.

## D.  Retaliation Claims

Moore also argues that CCBC engaged in retaliation against him.  Appellant Br. at 20–25.  To make out his prima facie case for retaliation, Moore must demonstrate that:  "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).  As with Moore's disparate-treatment claim, the district court assumed that he had made out his prima facie case for retaliation. *Moore*, 2023 WL 5647825, at *5.

CCBC does not contest the district court's assumption for the purposes of this appeal. Appellee Br. at 19–20.  The parties do not dispute that Moore filed claims that he was being discriminated against, that Boland and other managers knew about Moore's actions, or that Moore was terminated from CCBC.  Moore filed a number of grievances against CCBC in 2018, including one that pre-dated the random drug test on July 12, 2018 (which ultimately resulted in Moore's termination) by only six days. *See* R. 79-5 (Moore Grievances) (Page ID #2946–52). Given the temporal proximity between Moore filing his EEO grievances and the adverse employment action taken against him, Moore has shown "sufficient temporal proximity to establish a causal connection." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776–77 (6th Cir. 2018).

Once a plaintiff has sufficiently established their prima facie case for retaliation, the burden shifts to the defendant to show that they had a nondiscriminatory reason for their actions. CCBC asserts the same reasons for its actions as it does with regards to Moore's discrimination claim.  Appellant Br. at 20–21.  If these articulated reasons are legitimate, the burden again shifts to Moore to produce sufficient evidence to permit a reasonable factfinder to conclude that they

are pretextual. Again, Moore asserts that CCBC's proffered reasons are pretextual because similarly situated white employees were treated differently than he was. Appellant Br. at 27–29. With his discussion of CCBC's treatment of Voss and Wermeling, Moore has demonstrated that there is a genuine dispute of material fact on the question of pretext. Accordingly, we REVERSE and REMAND the district court's grant of CCBC's motion for summary judgment on Moore's retaliation claim, and REMAND for further proceedings.

## III. CONCLUSION

We REVERSE the district court's judgment that Moore failed to raise disputes of material fact concerning (1) whether he signed the LCA knowingly and voluntarily; and (2) whether CCBC's proffered reasons for terminating Moore were pretextual. We REMAND for proceedings consistent with our opinion.

———————————

**DISSENT**

———————————

ALICE M. BATCHELDER, Circuit Judge, dissenting.  Because the majority and I see this case differently, I must respectfully dissent.  For the reasons that follow, I would affirm the summary judgment for CCBC for the reasons contained in the district court's opinion.

CCBC fired Moore twice—for two separate reasons and two different and unrelated circumstances.  In June 2017, CCBC fired Moore for inciting a work slowdown, but his Union representative negotiated a reprieve through a one-page Last Chance Agreement (LCA).  They had a ten-minute meeting with the CCBC supervisor, and the Union rep advised Moore to "just sign [the LCA] and get back to work" because "[i]t's better to fight with a job than fight without a job."  So, Moore signed the LCA, which released CCBC "from any and all liability of any kind whatsoever, relating to [Moore's] employment with [CCBC], arising prior to th[at] date."  And Moore went back to work.  Then, in July 2018, Moore failed a random drug test and CCBC fired him again, this time permanently.  Moore sued, claiming that the circumstances of his "adverse employment action" established an actionable inference of unlawful racial discrimination and retaliation.

As an initial matter, an "adverse employment action" is a significant adverse change in employment status, such as a firing, reassignment with significantly different responsibilities, or a decision causing significant change in benefits, including the denial of a raise or promotion. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 607–08 (6th Cir. 2019).  Requiring an employee to submit to a drug test does not meet this definition and we have never held that drug testing is an adverse employment action, contrary to the majority's characterization of the drug tests at issue here.  Other Circuits have held that a compulsory drug test could be an adverse employment action if the "drug test is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees." *E.g.*, *Stockett v. Muncie Indiana Transit System*, 221 F.3d 997, 1001–02 (7th Cir. 2000).  Nothing here suggests that

CCBC's drug tests were the kind of harassing act that would constitute an adverse employment action. Therefore, Moore's only colorable "adverse employment actions" are the two firings.

Take the second one first. Moore failed a drug test. Even accepting that Moore can make out a prima facie case, that is a legitimate nondiscriminatory and nonretaliatory reason for CCBC to fire him. So Moore argues that it was not the "real" reason but was just a pretextual excuse to fire him. He argues that CCBC actually fired him because he is Black and to retaliate against him. As explained below, I am not persuaded that Moore has produced a material question for a jury as to whether this was pretextual. Rather, I agree with the district court's assessment that he has not.

As for the first firing, Moore waived any legal claim concerning that firing when he signed the LCA (and regained his job). I do not find the waiver ambiguous or confusing in any way: "any and all liability of any kind whatsoever" appears very clear to me, particularly when the LCA was *neither* a complex *nor* a lengthy legal document. It was one page long, including a one-paragraph waiver. *See* Doc. 76-6, PageID#2545. And, as explained below, I do not agree that Moore cannot be expected to understand this; we have never held that a waiver signor must have a highly relevant education before entering a waiver agreement. In fact, Moore's education supports the notion that a reasonable person with Moore's education could enter this waiver knowingly and voluntarily. Regardless, Moore signed the LCA based on consultation with—and upon the recommendation of—his Union representative, which is exactly the protection that unions provide their members.

I.

I proceed by assuming, as the district court did, that Moore met his prima facie burden for bringing his Title VII claims (racial discrimination and retaliation) related to his second termination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (race discrimination); *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997) (retaliation).[1] In turn, CCBC argues

---

[1]We review the district court's grant of summary judgment de novo, *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 528 (6th Cir. 2014), construing the evidence in the light most favorable to the nonmovant. *Sloat v.*

that Moore was fired—the second time—because of a positive drug test. That fact is undisputed and is a legitimate reason for Moore's second termination. *McDonnell Douglas*, 411 U.S. at 802–04 (explaining that "unlawful conduct" is a legitimate, nonretaliatory reason for adverse employment decisions). So, based on this record, Moore must show that there is a genuine issue of material fact as to whether CCBC's proffered reason was pretextual. *Id.* at 804–05; *see also Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 510–11 (6th Cir. 2022).

After a workplace accident involving an AGV and Moore's operation of a forklift, Moore was drug tested and placed on his SCA which subjected him to random drug tests for a period of 24 months. As the majority explains, Moore's initial post-accident drug test did not return positive results for purposes of CCBC's drug and alcohol policy. However, Moore was still placed on a Second Chance Agreement (SCA). Moore has not proffered evidence suggesting that this mistaken placement was anything other than a mistake. And an employer's mistakes or negligence—even baseless, foolish, or trivial actions—do not amount to pretext for Title VII discrimination or retaliation. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285–86 (6th Cir. 2007). Moreover, "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 896 (6th Cir. 2020) (internal quotation marks and citation omitted). Although Moore cannot prove that his being placed on the SCA was pretextual, he proffers more arguments.

Generally, Title VII plaintiffs try to show pretext through "one of three ways: (1) by showing that the employer's articulated reason had no basis in fact; (2) by showing that the reason would have been insufficient to motivate the employer's action; or (3) by showing that the reason did not actually motivate that action." *Blount*, 55 F.4th at 510 (citation omitted). These three pretext categories present a convenient way of asking if the employer terminated the employee for the stated reason or not. *Miles*, 946 F.3d at 888. To surpass the pretext-stage of the *McDonnell Douglas* burden-shifting framework at summary judgment, the plaintiff must present evidence which would permit a reasonable jury to reject the employer's proffered reason

---

*Hewlett-Packard Enter. Co.*, 18 F.4th 204, 209 (6th Cir. 2021). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

for taking the adverse action against the plaintiff. *Blount*, 55 F.4th at 510. Here, Moore has not met that burden.

In essence, Moore argues pretext by trying to show that CCBC's proffered reason for firing him the second time was insufficient to motivate the decision to fire him.**[2]** Typically, this is done by presenting evidence that other employees engaged in similar conduct but were not disciplined. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). These so-called Title VII comparators "should be similarly situated 'in all *relevant* respects.'" *Blount*, 55 F.4th at 511 (emphasis in original) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)). "Superficial similarities" between the plaintiff and his colleagues will not make them comparators to the plaintiff. *Id.* at 511–12. And, in the disciplinary context, to be similarly situated, the plaintiff and his proffered comparator must have committed acts of "comparable seriousness." *Wright*, 455 F.3d at 710. Moreover, differences in disciplinary

---

**[2]**Moore also argues that his second termination had no basis in fact, and that CCBC's proffered reason for the second termination (the over 300 ng per milliliter positive drug test) did not actually motivate CCBC's decision to terminate him. Moore advances the same pretext "facts" for each way to demonstrate pretext—CCBC allegedly treated similarly situated white employees better than him. These pretext arguments fail.

First, to show that an employer's proffered reason for terminating him had no basis in fact, Moore would have to show that the employer's proffered reason never happened, i.e., show "that the employer did not actually have cause" to terminate him. *Seeger*, 681 F.3d at 285 (citation omitted); *see also Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) ("[This] type of showing is easily recognizable and consists of evidence that the proffered [reasons] for the plaintiff's discharge never happened."), *overruled on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). It is undisputed that Moore tested well-above the threshold for a positive drug test, which is a legitimate basis for his termination. Therefore, Moore's second termination had a basis in fact. Accordingly, this no-basis-in-fact method of showing pretext is not a viable argument for Moore.

Second, to show that an employer's proffered reason for termination did not actually motivate the decision, Moore would have to advance an "indirect" attack on the reason through circumstantial evidence. *Manzer*, 29 F.3d at 1084. This method of showing pretext "admits that the reason could motivate the employer but argues that the illegal reason is more likely than the proffered reason to have motivated the employer." *Joostberns v. UPS*, 166 F. App'x 783, 791 (6th Cir. Jan. 9, 2006) (citing *Manzer*, 29 F.3d at 1084); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Moore simply has not presented enough circumstantial evidence to give rise to a genuine issue of material fact related to pretext under this circumstantial-pretext method. "This method . . . is not identical to a prima facie case. Rather, it requires the plaintiff to submit additional evidence." *Joostberns*, 166 F. App'x at 791 (citing *Manzer*, 29 F.3d at 1084). This "'additional evidence' requirement is limited to the production of evidence rebutting the defendant's proffered legitimate, nondiscriminatory reason for taking the challenged action." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 533 (6th Cir. 2007) (citation omitted). At summary judgment, Moore's "burden of producing evidence of pretext merges with the burden of persuasion, which always lies with the plaintiff." *Rosenthal v. Faygo Bevs., Inc.*, 701 F. App'x 472, 480 (6th Cir. July 17, 2017) (internal quotation marks omitted) (citing *Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 768 (6th Cir. 2004)).

history may dispel any notion that a supposed comparator is similarly situated to the plaintiff. *Tennial v. UPS*, 840 F.3d 292, 304 (6th Cir. 2016).

Moore argues that he was randomly drug tested six times pursuant to his second chance agreement (SCA). He further alleges that he was the only employee tested. Moore's own evidence shows that these claims are false. For starters, he was tested five times. *See* Doc. 79-11, PageID#2976. One of the supposed "six" tests was duplicative. The sample that Moore had given was unsuitable, so he had to give another sample for that test. Moreover, he was not the only person tested on the days during which CCBC conducted random drug tests. On July 14, 2017, both Moore and Larry Voss (a white employee) were drug tested. *Id.* Another employee—one who Moore does not allege is a comparator—was tested around the same time as Moore in July of 2018. Shonte Butts was drug tested on July 9, 2018, while Moore was tested on July 12, 2018. *Id.* And the record reflects that if an employee who is subject to random drug testing is not present on the testing day, then that employee will be drug tested on the next day possible. Doc. 72-3, PageID#2229. So, at least two of those tests were not done in isolation.

Based on this record, the majority's conclusion that the district court erred in holding "that Moore [had] failed to establish pretext" with regard to his second termination faces three problems. First, this case is before us on summary judgment. Therefore, we review whether Moore has presented evidence from which a reasonable jury could conclude that he established pretext. Second, Larry Voss (a white employee)—Moore's only true Title VII comparator—was not treated so differently that we can conclude that Moore has presented evidence which could permit a reasonable jury to conclude that he was pretextually terminated. Third, by concluding that John Wermeling (another white employee) is a Title VII comparator, the majority impermissibly expands who can be considered such a comparator.[3]

---

[3]The majority also mentions "Paul Minland" in passing, stating that he was a white employee who had a workplace accident but was not drug tested. To the reader of the majority opinion, the majority's inclusion of Minland would suggest that another Title VII comparator was treated better than Moore. Beyond speculation and conjecture, the record is devoid of information on Paul Minland and whether he had a workplace accident, whether he was ever disciplined, if he was subject to an SCA, or if he was ever drug tested. "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

Like Moore, Larry Voss was subject to random drug tests after being placed on an SCA, effective from June 5, 2015, to June 5, 2017. The record reflects that Voss was tested four times pursuant to that agreement. Doc. 80-1, PageID#3023. On May 3, 2017, Voss was drug tested after having a workplace accident. Doc. 79-11, PageID#2976. But he was not fired until October 3, 2018, after he failed another random drug test. This test, submitted on September 18, 2018, was conducted *outside* of Voss's SCA timeframe but was conducted pursuant to the expired SCA. Doc. 72-5, PageID#2247; Doc. 79-22, PageID#2998–3000.

To be sure, Voss is similarly situated to Moore. Both men were tested a similar number of times pursuant to their respective SCA's—Voss four times and Moore five times. And Voss was tested another time—after his SCA had expired but still under the "authority" of the expired SCA—which resulted in a positive test, leading to his ultimate termination. But, to demonstrate pretext based on a Title VII comparator's treatment, Moore must show that the comparator was *not* disciplined for substantially similar conduct. *McDonnell Douglas*, 411 U.S. at 804. Here, Voss *was* disciplined. This should be the end of it. Moore cannot prove pretext based on how CCBC treated Voss.

However, the majority takes issue with the fact that Voss was not immediately fired after a positive drug test (post-workplace accident), but that fact is immaterial to our Title VII analysis. Both men were ultimately fired pursuant to SCA agreements. To conclude otherwise—thereby making that fact material—is to give credence to an inference entirely *unsupported* by the record. That inference must go something like this: CCBC wanted Moore fired so badly that when Voss tested positive *after* his SCA's expiration, CCBC had to fire Voss to cover its firing of Moore (who tested positive within his own SCA's timeframe). In other words, Voss's firing was only done as part of a discriminatory and retaliatory scheme to get rid of Moore. This speculative inference is *not* supported by the record. At summary judgment, we are not required to construe speculative inferences and conclusory allegations as genuine issues of material fact. *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009); *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (explaining that circumstantial evidence of retaliation amounting to no "more than bare allegations" will not be enough to defeat a motion for summary judgment).

Unlike Moore, Wermeling was not subject to an SCA. Contrary to the majority's characterization, Wermeling was not involved in a similar workplace accident, i.e., he was not operating equipment when he walked into an AGV and passed out on the floor of the CCBC warehouse. Doc. 79-8, PageID#2958–59; Doc. 79-12, PageID#2977. So, he was not subject to the same disciplinary actions applicable to those who cause workplace accidents. Remember, differences in disciplinary history may dispel any notion that a supposed comparator is similarly situated to a Title VII plaintiff. *Tennial*, 840 F.3d at 304. In fact, Moore has put on little evidence about Wermeling other than some speculation that he was a supposed alcoholic in the warehouse. But the majority decides for itself that Wermeling *should have been* drug tested. Apparently, the majority's Wermeling-should-have-been-drug-tested decision is evidence that Wermeling is similarly situated to Moore. Not so. The record reflects that the plant manager—who had the capability to fire warehouse employees—was not aware of Wermeling's apparent alcohol problems. Doc. 72-3, PageID#2229–30; Doc. 79-12; PageID#2977–81. Moore and Wermeling were not engaged in similar misconduct; nor were Moore and Wermeling subject to similar disciplinary actions. *Cf. Miles*, 946 F.3d at 894. Therefore, Wermeling is not similarly situated to Moore in all relevant respects. Wermeling is not a comparator.

The only similarity between Moore and Wermeling—not counting the majority's factual characterizations and decisions—is that both men worked for the CCBC warehouse as forklift operators. Relying on this sole similarity, the majority has now done away with the "all relevant respects" requirement. *Contra Blount*, 55 F.4th at 511. Under the majority's analysis in this opinion, only one inquiry is relevant to determine whether someone is a Title VII comparator: did he or she work at the same company as the Title VII plaintiff and have a different work experience? If so, stop there. That person is a *comparator*. What were formerly superficial similarities, *see id.* at 511–12, are now all that is required to establish that one is a comparator for Title VII purposes. But our binding precedent requires asking whether any proffered comparator was similarly situated in all *relevant* respects and if that comparator had engaged in acts of comparable seriousness. *Id.*; *see also Tennial*, 840 F.3d at 304.

II.

The majority opinion reads as though, based on Moore's education and type of education, a reasonable juror could conclude that he did not knowingly and voluntarily enter the LCA. Once more, not so. First, the majority's education-factor analysis and conclusion distorts our "knowing and voluntary" test for waiver agreements, twisting the test into a subjective one rather than an objective, reasonable person test. Second, and relatedly, we have never held that a person entering a waiver agreement (a "signor") must have a specific level or type of education to sign a waiver knowingly and voluntarily. Third, Moore's education actually supports the assumption that he could enter the waiver knowingly and voluntarily. Fourth, and finally, the other waiver factors also support the assumption that Moore could enter the waiver knowingly and voluntarily.

We apply "ordinary contract principles" to determine whether a waiver agreement is valid. *Seawright v. Am. Gen. Fin., Inc.*, 507 F.3d 967, 973 (6th Cir. 2007) (citing *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003) (en banc)); *see also Nicklin v. Henderson*, 352 F.3d 1077, 1080 (6th Cir. 2003) ("Federal common law controls the validity of a release of a federal cause of action."). In applying these principles, "as with any other contract, the parties' intentions control." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)); *see also Adams v. Philip Morris, Inc.*, 67 F.3d 580, 585 (6th Cir. 1995). Those intentions are marked by the contract, and when the contract is "clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *M&G Polymers USA, LLC*, 574 U.S. at 435 (citing 11 R. Lord, Williston on Contracts §30:6, p. 108 (4th ed. 2012) (Williston) (internal quotation marks omitted)). But when contractual terms are ambiguous, we give those terms their ordinary and natural meaning from the perspective of a reasonable person entering the contract (or waiver) at issue. *See Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 426 (6th Cir. 2016); *Seawright*, 507 F.3d at 973; *Adams*, 67 F.3d at 583 (applying "ordinary contract principles in determining whether . . . a waiver is valid"); *see also Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016) (explaining that "[m]ateriality in contract law" depends on a reasonable person standard). In other words, when we apply

ordinary contract principles to a waiver issue such as this, we apply an objective, reasonable-person test. Put differently, we ask whether a reasonable person entering the waiver agreement *at issue* would be able to do so knowingly and voluntarily.[4]

To answer this inquiry, we use a set of five factors to evaluate whether a signor entered a waiver agreement knowingly and voluntarily. *Tillman v. Macy's, Inc.*, 735 F.3d 453, 461 (6th Cir. 2013). We balance (1) the signor's experience, background, and education; (2) the amount of time that the signor had to consider the waiver, including whether the signor could have consulted an attorney; (3) the clarity of the waiver; (4) consideration for the waiver; and (5) the totality of the circumstances. *Id.* We use this "knowing and voluntary" waiver-test to compare the immediate signor's situation with other analogous signors, directing ourselves back to ordinary contract principles and whether a reasonable person could enter the waiver knowingly and voluntarily. *Seawright*, 507 F.3d at 973–74 (citing *Morrison*, 317 F.3d at 668); *Adams*, 67 F.3d at 583; *see also Solomon v. Carite Corp. LLC*, 837 F. App'x 355, 362 (6th Cir. Nov. 23, 2020).

The majority homes in on Moore's education, stating that "a reasonable juror could find that [his] fashion merchandising and healthcare administration [post-secondary] degrees did not

---

[4]While our precedent suggests, and the majority recognizes, that we "must remain[] alert to ensure that employers do not defeat the policies of . . . Title VII by taking advantage of [a] superior bargaining position," *McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 303 (6th Cir. 2018) (internal quotation marks and citation omitted), the jurisprudential weight of this suggestion is suspect. Principally, this suggestion places "a thumb on the scale" in favor of employees when considering the validity of a waiver in the Title VII context. *Cf. M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 438 (2015) (discussing "placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements"). Such thumb placing "has no basis in ordinary principles of contract law. And it distorts the attempt to ascertain the intention of the parties." *Id.* (internal quotation marks and citation omitted). Moreover, "[m]ere inequality in bargaining power . . . is not a sufficient reason to" claim that an agreement is invalid. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991).

Of course, when an employer abuses his or her position in bargaining over a waiver, then we ought to consider that abuse as a factor cutting against knowing and voluntary entry into a waiver agreement. Such abuse could manifest itself in the form of an unconscionable contract marked by unfairness, oppression, or a lack of meaningful choice. *Morrison v. Circuit City Stores, Inc.*, 70 F. Supp. 2d 815, 821 (S.D. Ohio 1999) *aff'd*, 317 F.3d 646 (6th Cir. 2003); *see also Hayes v. Oakridge Home*, 122 Ohio St. 3d 63, 67–71 (Ohio 2009); *Unconscionable Agreement*, Black's Law Dictionary (12th ed. 2024). Here, the record reflects that CCBC did not abuse that position. *Cf. Solomon v. Carite Corp. LLC*, 837 F. App'x 355, 363 (6th Cir. Nov. 23, 2020); *Gascho v. Scheuer Hosp.*, 400 F. App'x 978, 983 (6th Cir. Nov. 17, 2020) ("An ordinary offer to make a contract commonly involves an implied threat by one party, the offeror, not to make the contract unless his terms are accepted by the other party, the offeree." (citing Restatement (Second) of Contracts § 176 cmt. a (2010))). Moore's union representation was lackluster, but both CCBC and Moore had the right to rely on that representation in negotiating the LCA.

provide him with sufficient education or experience to understand that he was specifically waiving his rights to bring past discrimination and retaliation claims. . . ." By homing in on Moore's education and the type of his education, the majority impermissibly makes the waiver-test subjective instead of asking whether a reasonable person in Moore's situation could knowingly and voluntarily enter the LCA.

Relatedly, the majority distorts our waiver precedent related to a signor's education and experience, making it a more subjective inquiry to the immediate signor's level and type of education. In effect, this distortion creates a new requirement that signors must have highly relevant education.[5] We have never held that signors must possess a certain level and type of education to enter a waiver agreement. *See, e.g.*, *Soltis v. J.C. Penney Corp.*, 635 F. App'x 245, 250 (6th Cir. Dec. 18, 2015) ("Regarding the first factor, [the signor] only agues that she has not previously dealt with signing [waivers] but cites no authority to support that such experience is required under our precedent."). And Moore has not cited to any authority in our circuit stating that a signor must have some highly relevant experience or education to enter a waiver knowingly and voluntarily. The majority looks to *Seawright*, 507 F.3d at 974, and *Morrison*, 317 F.3d at 668, for support of its new requirement. To be sure, both cases discuss each respective signor's education and experience. In *Seawright*, the majority held that "an educated, managerial employee" was capable of understanding the waiver at issue while explaining that other factors, such as time and clarity, supported concluding that she knowingly and voluntarily entered the waiver. 507 F.3d at 973–74. In *Morrison*, the majority concluded that the signor knowingly and voluntarily entered her waiver agreement because she was a "highly educated managerial employee" presented with a "plain" and clear waiver, and she had three days to consider it. 317 F.3d at 668. But these cases found that the signors *were* capable of knowingly

---

[5]Consider the absurdity of this distortion/requirement. Take, for instance, the agreement one signs when getting a new cell phone or the terms and conditions that we all tacitly agree to before updating our latest technology gadgets. As the signor, based on the majority opinion, one cannot conceivably enter those agreements (which include waivers) knowingly and voluntarily unless he or she has a background in technology, or a legal education *as related* to technology or intellectual property. And, based on the majority opinion, one might need both. It does not take an economist to understand what happens next. The pool of potential consumers who can knowingly and voluntarily enter these tech-agreements is virtually drained. The common men and women of this country lose in that scenario. Do the large tech companies entrenched in a jungle of rules and regulations change their agreements in turn? Likely not. It is not for the judiciary to act as legislators, imposing veiled requirements with no judicial or legislative basis.

and voluntarily entering the agreements. Neither case turned on the specific level and type of education that a signor had or made education and experience dispositive, opting, instead, to faithfully apply our knowing-and-voluntary test for waivers by balancing the factors while using ordinary principles of contract law.

Our precedent requires that we consider whether the signor's "experience, background, and education" generally indicate whether the signor entered the waiver knowingly and voluntarily while considering the other factors, *not* that the signor have some certain level or type of experience or education. *See, e.g.*, *Tillman*, 735 F.3d at 461–62 (explaining that although the signor was only a "high-school graduate," she could still understand the waiver because it was clear and she had ample time to consider it and could consult an attorney); *Seawright*, 507 F.3d at 973–74; *Adams*, 67 F.3d at 582, 583 (explaining that the experience and background of the signor, who worked for the defendant-employer for nine years, supported the conclusion that he could enter the waiver knowingly and voluntarily). No precedential opinion requires what the majority does—that a signor have some highly relevant experience, background, or education. And, albeit unpublished, multiple cases in our circuit directly contradict the majority opinion on this front. *See Solomon*, 837 F. App'x at 362 (explaining that a high-school-level education and some post-secondary education, along with experience reviewing car sales contracts, supported the signor's knowing and voluntary waiving of Title VII claims); *Hank v. Great Lakes Constr. Co.*, 790 F. App'x 690, 699 (6th Cir. Oct. 18, 2019) (explaining that general education will support knowing and voluntary entry into a waiver); *Soltis*, 635 F. App'x at 250; *Sako v. Ohio Dep't of Admin. Servs.*, 278 F. App'x 514, 518–19 (6th Cir. May 16, 2008) (explaining that a French-speaking African immigrant with a high school diploma could understand the waiver at issue even with his background and that level of education).**[6]**

---

**[6]**In addition, none of our sister circuits conducts a hyper-subjective level-and-type-of-education analysis or imposes a *highly relevant* requirement for experience, background, and education in Title VII waiver cases. *See Geoffroy v. Town of Winchendon*, 959 F.3d 1, 8 (1st Cir. 2020); *Long v. Corning Inc.*, 847 F. App'x 74, 75 n.7 (2d Cir. May 10, 2021) (citing *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438 (2d Cir. 1998)); *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 781 (3d Cir. 2007); *Cassiday v. Greenhorne & O'Mara, Inc.*, 220 F. Supp. 2d 488, 493–94 (D. Md. 2002), *aff'd per curiam*, 63 F. App'x 169 (4th Cir. May 21, 2003); *Smith v. Amedisys Inc.*, 298 F.3d 434, 441 (5th Cir. 2002); *Hakim v. Accenture United States Pension Plan*, 718 F.3d 675, 684 (7th Cir. 2013); *Warnebold v. Union P. Railroad*, 963 F.2d 222, 223–24 (8th Cir. 1992); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 (9th Cir. 2007) (explaining that work experience and college-level education was sufficient experience and

Furthermore, Moore's experience, background, and education actually support the assumption that he entered his LCA knowingly and voluntarily. He signed a similar second chance agreement, demonstrating familiarity with the disciplinary process at the CCBC warehouse. He had worked at the CCBC warehouse for roughly three years, beginning on March 24, 2015. And he has two post-secondary education degrees. *Cf. Seawright*, 507 F.3d at 974 (describing the signor as "educated"). Presumably, an individual possessing both a fashion merchandising degree and a health-care administration degree is capable of reading and comprehension. Granted, Moore did not go to law school, and he may not be entirely familiar with legal terms. But we have held that signors with less experience and education have been able to knowingly and voluntarily enter Title VII waiver agreements. *See Solomon*, 837 F. App'x at 362 ("[H]igh-school-level education [and] some post-secondary education . . . [with] experience reviewing and executing car sales contracts."); *Hank*, 790 F. App'x at 699 (explaining that "a forty-nine-year-old man with a GED, post-high-school level proficiency in reading and word comprehension, and high-school-level spelling skills" could understand the waiver); *Sako*, 278 F. App'x at 518–19. Moore's education, background, and experience cut in favor of his being able to knowing and voluntarily enter the LCA waiver.

Moreover, the other waiver factors point to the fact that Moore knowingly and voluntarily entered the LCA waiver. As mentioned, waiver of "any and all liability of any kind whatsoever" in a one-page document with a one-paragraph waiver appears very clear and understandable to me. We have held that waivers employing virtually identical language are clear or "plain" and "unambiguous" to the signor. *Cf. Seawright*, 507 F.3d at 974 (explaining that the waiver "clearly stated that employees . . . would be waiving their rights to sue in federal court"); *Nicklin*, 352 F.3d at 1081 (explaining that the "plain language" of a "one-and-a-half page document" "unambiguously cover[ed] all" of the plaintiff's claims); *Adams*, 67 F.3d at 582, 583 (describing a waiver that "release[d], remise[d], and forever discharge[d]" the defendant "of and from all and in all manner of presently existing actions, causes of action, suits, debts, claims, and demands whatsoever in law or equity" as "plain and unambiguous"); *Solomon*, 837 F. App'x at 363

---

education to enter the Title VII waiver knowingly and voluntarily); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991); *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1124–25 (11th Cir. 2014); *Russell v. Harman Int'l Indus.*, 773 F.3d 253, 255–56 (D.C. Cir. 2014).

(explaining that a waiver that "waive[d] an employee's right to pursue [federal] rights and remedies in a judicial forum" was "unambiguous," leaving "no room for doubt about [its] meaning" (internal quotation marks omitted)). Unfortunately, here, the majority imposes another requirement for waivers in the name of interpreting our precedent—that to be clear, waivers must specifically spell out what legal claims the signor is waiving. As explained, and yet again, not so. Additionally, Moore could have asked for more time to review this one-page agreement with a one-paragraph waiver. He did not. *See Nicklin*, 352 F.3d at 1081; *Shupe v. Asplundh Tree Expert Co.*, 566 F. App'x 476, 482–83 (6th Cir. May 22, 2014).

In this circuit, we have said that it is the plaintiff's "obligation to seek assistance before" signing the agreement "if [he] felt [he] did not understand [it]." *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 461 (6th Cir. 1986). But Moore *had* union representation during the meeting (albeit not the best), and the record reflects that Moore did not ask for clarification or for any additional assistance. The LCA was also supported by adequate consideration: Moore got his job back in exchange for waiving his claims against CCBC. *Cf. Morrison*, 317 F.3d at 667–68; *see also Cuspide Props. v. Earl Mech. Servs.*, 53 N.E.3d 818, 830 (Ohio Ct. App. 2015). Put simply, the totality of the circumstances points to the fact that Moore entered the LCA knowingly and voluntarily. Any reasonable person in his situation with prior work experience with CCBC and *two* post-secondary education degrees and union representation, faced with a one-paragraph waiver marked by plain language in a one-page document, would be able to knowingly and voluntarily enter the waiver. Therefore, any pre-LCA claims were waived and are no longer actionable.

III.

At least the way I read it, the majority opinion suggests—whether intentionally or not—that (1) "similarly situated employees" includes any other employee without limitation and (2) "knowing and voluntary" for purposes of waiver (and presumably contract formation) is now a subjective test based on that specific person's level and type of education. Because I cannot agree with any of this, I must respectfully dissent.