# United States Court of Appeals
## For the First Circuit

No. 19-1573

WILLIAM GEOFFROY,

Plaintiff, Appellant,

v.

TOWN OF WINCHENDON, MASSACHUSETTS; SCOTT LIVINGSTON;
JAMES KREIDLER; DAVID WALSH,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Danielle Callahan Gill and Callahan Law Group, LLC were on
brief for appellant.
Leonard H. Kesten, Jeremy Silverfine, Deidre Brennan Regan,
and Brody, Hardoon, Perkins & Kesten, LLP were on brief for
appellee.

May 13, 2020

**LYNCH**, **Circuit Judge**.  Plaintiff William Geoffroy, a former Winchendon police officer, brought claims of age discrimination, retaliation, and defamation against the Town of Winchendon, Massachusetts; its Chief of Police, Scott Livingston; its Town Manager, James Kreidler; and Lieutenant David Walsh ("the defendants").[1]

The claims arise from Geoffroy's decision to resign with a pension after the defendants ascertained he had made several threats against his former girlfriend.  He did so instead of facing termination and the possibility of losing his pension and being criminally charged.  Geoffroy also signed a separation agreement, in which he waived and released any claims he had against the defendants up and through signing the separation agreement.

Geoffroy claimed that the defendants punished him far more severely than they did younger officers and that he was denied a law enforcement retirement identification card in retaliation for filing an age discrimination claim.  Geoffroy argued that the waiver and release in his separation agreement were invalid because he was not given twenty-one days to review them, which violated the Older Workers Benefit Protection Act ("OWBPA").

The district court granted summary judgment on the age discrimination and OWBPA claims for the defendants, concluding

---

[1]    The defendants' positions are listed as of the time of the underlying facts.

- 2 -

that Geoffroy's waiver and release were knowing and voluntary.  A jury then found for the defendants on the retaliation and defamation claims.

On appeal, Geoffroy challenges the district court's grant of summary judgment, arguing that his waiver and release violated the OWBPA and were not knowing and voluntary, and the withdrawal of an exhibit at trial.  We reject both challenges and affirm.

I.

We review the district court's grant of summary judgment relying only on the summary judgment record and so include only those facts here.  J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1250 (1st Cir. 1996).  We discuss the trial record where relevant to the evidentiary issue.

A.  Facts

Geoffroy joined the Winchendon Police Department in 1985.  While a police officer, Geoffroy dated Catherine Phongsaly from June to July 2011.  At 1:30 a.m. on October 8, 2011, Geoffroy, having consumed two-and-a-half beers, drove to Phongsaly's home. After seeing another person's car there, he left.  About thirty minutes later, he called Phongsaly, left her a two-to-three-minute voicemail, and sent her twenty-eight text messages.  In the voicemail, Geoffroy used profane language repeatedly and told

Phongsaly that she was "lucky [he] didn't kick [her] f***ing door in."  (Alterations in original.)

On October 10, 2011, Phongsaly told Sergeant Gerald Gagne of the voicemail and text messages.  Later that day, Sergeant Raymond Anair spoke to Phongsaly, who described the voicemail and another instance of Geoffroy's threatening behavior.  Anair told her that she could file for a chapter 209A restraining order, but Phongsaly declined.

On October 14, 2011, Walsh took Phongsaly's statement. Phongsaly told Walsh how, after she and Geoffroy had separated, Geoffroy often verbally abused her, drove by her house late at night, showed up at her workplace during her shift, and ran the license plates of cars parked outside of her house.

On or about October 17, 2011, Geoffroy met with Walsh, Livingston, and Geoffroy's union president, Martin Rose.  The four listened to a tape of the voicemail.  They then discussed Geoffroy's potential discipline:  demotion and suspension, termination, or resignation in lieu of termination.

On October 19, 2011, Geoffroy met with Kreidler, Livingston, Walsh, union representative Michael Bombard, and union attorney Michael Clancy.  Kreidler gave Geoffroy a choice: Geoffroy could (1) resign and claim his pension; or (2) be terminated and potentially lose his pension and be criminally

charged.  Geoffroy later testified that, to "save [his] pension," he chose to resign.

Geoffroy received by email the "Separation Agreement and General Release" ("separation agreement") sometime between the October 19 meeting and when he signed the separation agreement on October 24, 2011.  Geoffroy could not open the email attachment containing the separation agreement and asserts that he did not see a copy of the separation agreement until the day he signed it.

The separation agreement outlined the terms of Geoffroy's resignation and benefits.  It contained a waiver and release of any claims that arose up and through signing the waiver and release.  The separation agreement allowed Geoffroy to remain on paid leave until April 21, 2012, at which time he would officially retire.  He would then receive his pension.  The separation agreement stated that, by signing it, Geoffroy acknowledged he had the right to, and had been advised to, discuss the separation agreement with an attorney and was entering into the separation agreement voluntarily.  The separation agreement stated that Geoffroy had a waivable, twenty-one-day period to review the separation agreement before signing and a seven-day period after signing during which he could revoke the agreement. Finally, the separation agreement's completeness clause stated that Geoffroy and the Town "acknowledge[d] that [they had] not executed this [separation agreement] in reliance upon any . . .

representation or promise" "not contained in this [separation a]greement."

Geoffroy spoke to both Rose and Bombard separately after the October 19 meeting. Both advised Geoffroy that it was his decision to make. Bombard counseled Geoffroy not to resign. Clancy and Geoffroy also discussed the separation agreement after the October 19 meeting but before he signed the separation agreement on October 24, 2011.

After the October 19 meeting but before executing the separation agreement, Geoffroy chose to resign. He testified that he did so based upon the choice given to him. On October 24, 2011, Geoffroy signed the separation agreement and then submitted a notice of resignation for the sole purpose of retirement, effective April 21, 2012.

Almost six months later, on April 12, 2012, Geoffroy filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"). He alleged age discrimination by Livingston and the Town of Winchendon. He claimed that younger officers had committed "violent acts and/or . . . serious offenses" but had not faced such severe discipline.

In November 2012, Geoffroy requested from Livingston a law enforcement retirement identification card. Livingston called the President of the Massachusetts Chiefs of Police Association, Bill Brooks, to the discuss the good standing requirement for

receiving an identification card. Livingston then concluded that Geoffroy had not retired in "good standing," because he resigned while under investigation for conduct unbecoming of a police officer. Livingston denied the request. Geoffroy filed a second MCAD complaint that alleged this denial was in retaliation for the first MCAD complaint.

B. Procedural History

In October 2014, Geoffroy filed suit in Massachusetts state superior court against the Town of Winchendon, Livingston, Kreidler, and Walsh. His amended complaint alleged unlawful age discrimination in violation of Mass. Gen. Laws ch. 151B, § 4(1B)[2] and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; unlawful retaliation in violation of Mass. Gen. Laws ch. 151B, § 4(4); violations of the OWBPA, see 29 U.S.C. §§ 623, 626, 630; and defamation.

On December 18, 2014, the defendants removed the case to the United States District Court for the District of Massachusetts under federal question jurisdiction. Discovery took place from December 10, 2015, to December 2, 2016. On January 20, 2017, the

---

[2] While Geoffroy's complaint states that he brings a claim under Mass. Gen. Laws ch. 151B, § 4(1B), we note that section 4(1B) applies to "an employer in the private sector" while section 4(1C) applies to "the commonwealth [and] any of its political subdivisions." Because we find Geoffroy's age discrimination claims waived, however, we need not address under which provision he brings his state-law claim.

defendants moved for summary judgment on all counts. On September 30, 2017, the district court concluded that Geoffroy had voluntarily waived and released his age discrimination claims and granted partial summary judgment as to them. But the court determined that the retaliation and defamation claims turned on disputed facts, and so denied summary judgment on those claims.

The parties went to trial on April 29, 2019. Geoffroy argued that Livingston denied him an identification card in retaliation for his age discrimination complaint. The defendants countered that Geoffroy had not resigned in "good standing," which made him ineligible for a card. The defendants introduced Exhibit 54, a Winchendon regulation on police identification cards, which Livingston testified that he used to determine Geoffroy's standing. The regulation states that an officer "charged with or suspected of criminal activity at the time of retirement, [or] . . . under investigation or facing disciplinary action" has not retired in good standing. Livingston testified that he also relied on his conversation with Brooks.

Later in the trial, the district court expressed concern that, although the regulation was issued before the denial, it did not go into effect until fifteen days after the denial. The court stated that it would instruct the jury accordingly. In his closing, Geoffroy asserted that the jury should review the regulation and disregard Livingston's testimony because the

regulation post-dated the denial. The district court instructed the jury not to discuss or consider this regulation. The court then withdrew Exhibit 54 without objection.

During its deliberations, the jury asked the court: "Can we get some clarification on what evidence we are supposed to ignore in regard to good standing." The court reiterated that there was testimony about the regulation, restated that the regulation was not effective when Geoffroy's request was denied, and referred the jury once more to the instructions.

On May 3, 2019, the jury returned a verdict for the defendants. On May 30, 2019, Geoffroy moved for a new trial, which the court denied. Geoffroy timely appealed the summary judgment and new trial orders.

## II.

On appeal, Geoffroy challenges the summary judgment order and the withdrawal of Exhibit 54.

A. Standard of Review

We "review . . . the district court's grant of summary judgment . . . de novo, assessing the facts and the inferences to be drawn from them in the light most favorable to the non-moving party." Hightower v. City of Bos., 693 F.3d 61, 70 (1st Cir. 2012). As said, we do not rely on any facts not before the district court at summary judgment. J. Geils Band Emp. Benefit Plan, 76 F.3d at 1250. "We may affirm a grant of summary judgment 'on any

ground revealed by the record.'" Robinson v. Town of Marshfield, 950 F.3d 21, 24 (1st Cir. 2020) (quoting Santangelo v. N.Y. Life Ins. Co., 785 F.3d 65, 68 (1st Cir. 2015)). But "we cannot accept 'conclusory allegations, improbable inferences, and unsupported speculation.'" Theidon v. Harvard Univ., 948 F.3d 477, 502 (1st Cir. 2020) (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

We review for abuse of discretion preserved challenges to the exclusion of evidence. See Shervin v. Partners Healthcare Sys. Inc., 804 F.3d 23, 41 (1st Cir. 2015).

B.  Geoffroy Knowingly and Voluntarily Waived and Released His Age Discrimination Claims

Geoffroy argues that he did not waive or release his age discrimination claims because (1) the waiver and release violated the OWBPA and (2) he signed the separation agreement under duress. We disagree. Geoffroy's waiver and release of claims satisfy both the OWBPA and federal common law and the record provides multiple bases with which to affirm.[3]

---

[3]  Geoffroy also argues that the district court applied the wrong legal test by not expressly addressing the requirements of the OWBPA. But the record shows that Geoffroy voluntarily waived and released his claims under both the OWBPA and federal common law, so we need not address this argument. See Robinson, 950 F.3d at 24.

- 10 -

1. Geoffroy's Waiver and Release Satisfied the OWBPA's Requirements

The OWBPA requires that a waiver or release of ADEA claims be "knowing and voluntary," which "'at a minimum' [must] satisf[y] certain enumerated requirements." Oubre v. Entergy Operations, Inc., 522 U.S. 422, 426 (1998) (quoting 29 U.S.C. § 626(f)(1)). The only requirement at issue here is that the waiving party must be "given a period of at least 21 days within which to consider the agreement" of which the waiver or release is a part. 29 U.S.C. § 626(f)(1)(F)(i).

Geoffroy argues that, although the waiver and release afforded him a twenty-one-day review period, he was told "that he would only have a day or two . . . to sign it or not." He claims the defendants shortened his review period in violation of the OWBPA. Not so.

The record does not substantiate Geoffroy's argument. Geoffroy's "conclusory allegations . . . and unsupported speculation" to the contrary cannot save his claims. Theidon, 948 F.3d at 502 (quoting Benoit, 331 F.3d at 173).

Geoffroy never testified that anyone told him he had to sign a waiver and release the next day or within days of the October 19 meeting. He merely testified he was "[u]nder duress." Geoffroy also does not cite any testimony of Kreidler's.

- 11 -

Geoffroy's argument relies solely on Clancy's deposition testimony, which does not evidence any restriction.

Contrary to Geoffroy's argument, Clancy did not testify that Geoffroy "had to make his decision within [a five day] time period."  Clancy testified that he thought Kreidler "wanted a decision in one day."  This statement only shows that Clancy believed Kreidler wanted to know the "next day" in what direction Geoffroy wanted the discussions to go:  that is, whether there was going to be "an agreement or . . . discipline and a criminal investigation."[4]  The statement does not support Geoffroy's claim that "he only had a few days to sign the [separation a]greement or he would be terminated."  Further, at that time, there was no separation agreement and the record does not show any discussion of a waiver and release.

Kreidler's comment, if made, was made only once and never repeated over the five days between the October 19 meeting and the meeting at which Geoffroy signed the separation agreement.  This five-day gap, during which the defendants never contacted Geoffroy about his delay in signing, refutes Geoffroy's claim that he was required to sign the separation agreement within a "day or two" of

---

[4]    Similarly, Clancy's testimony that he "didn't think [more time] was an option" referred to having more time "to consider Mr. Geoffroy's options"; that is, in what direction to take negotiations.  This is supported by Clancy's testimony that "there wasn't really a request for more time at that point because [he] hadn't seen the document."

receiving it.[5]  Clancy's testimony alone does not show a violation of the OWBPA.[6]

In addition, it is important to point out that the OWBPA expressly requires only that a <u>waiver or release</u> of an ADEA claim be part of a written agreement and "the individual [be] given a period of at least 21 days within which to consider the agreement." 29 U.S.C. § 626(f)(1)(A), (F)(i).  "The statutory command is clear: An employee 'may not waive' an ADEA claim unless the <u>waiver or release</u> satisfies the OWBPA's requirements."  <u>Oubre</u>, 522 U.S. at 426-27 (emphasis added).  As a matter of law, the OWBPA provision applies to the waiver or release of ADEA claims.  It does not apply to a separate written agreement as to a resignation in lieu of being fired.  <u>See</u> <u>Blackwell</u> v. <u>Cole Taylor Bank</u>, 152 F.3d 666, 670 (7th Cir. 1998) (applying the OWBPA's review period requirement to the "[decision] whether to sign the waiver in exchange for an

---

[5]    Geoffroy also cites Rose's testimony, which states that, after the October 19 meeting, Rose asked Livingston on Geoffroy's behalf for more time for Geoffroy to consider his options.  But we need not address this testimony or whether it would support Geoffroy's OWBPA claim, as Geoffroy failed to cite this evidence or argue its meaning to the district court.  <u>See</u> <u>Serra</u> v. <u>Quantum Servicing, Corp.</u>, 747 F.3d 37, 43 (1st Cir. 2014) ("[A]rguments . . . never raised below . . . are . . . barred by our waiver doctrine.").

[6]    The gap in time, the lack of an express restriction on the waiver and release review period, and the defendants' dispute of this testimony all distinguish the instant case from <u>Cole</u> v. <u>Gaming Entm't, L.L.C.</u>, 199 F. Supp. 2d 208 (D. Del. 2002), Geoffroy's key case.

additional severance payment," not the "[decision] whether to quit," for which the plaintiffs had less than a day).

 2. <u>Geoffroy's Waiver and Release Were Knowing and Voluntary Under Federal Common Law</u>

An OWBPA-compliant waiver or release must also be knowing and voluntary under federal common law. See <u>Melanson</u> v. <u>Browning-Ferris Indus., Inc.</u>, 281 F.3d 272, 274 & n.2 (1st Cir. 2002); <u>Bennett</u> v. <u>Coors Brewing Co.</u>, 189 F.3d 1221, 1228-29 (10th Cir. 1999) ("[W]e must look beyond the [OWBPA-]specified statutory minimum requirements."). The test for this is federal common law. See <u>Melanson</u>, 281 F.3d at 276; <u>accord</u> <u>Bennett</u>, 189 F.3d at 1228; <u>Griffin</u> v. <u>Kraft Gen. Foods, Inc.</u>, 62 F.3d 368, 373-74 (11th Cir. 1995). Without addressing the common-law test, Geoffroy baldly asserts that he signed the separation agreement under duress. This argument is meritless.

We determine whether a waiver or release of claims was knowing and voluntary by applying a totality-of-the-circumstances test. <u>Melanson</u>, 281 F.3d at 276. We often look to a non-exhaustive set of six factors:

> (1) plaintiff's education and business experience; (2) the respective roles of the employer and employee in the determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver.

- 14 -

Id. at 276 & n.4. No single factor is dispositive or necessary. Id. at 274, 276. Importantly, "duress, without more, [cannot] be inferred from merely the emotional and financial stress associated with loss of a job." Id. at 277.

The factors show that Geoffroy voluntarily waived and released his claims.[7] Geoffroy had sufficient education and experience to understand the waiver and release. That is because he: (1) had graduated high school; (2) had obtained college credits;[8] (3) had served previously as the union secretary; (4) had become personally familiar with "reprimands and suspensions and appeals processes," as well as settlement agreements related to disciplinary issues; and (5) had received independent advice through his union. Importantly, Geoffroy does not dispute that he understood the waiver and release, which demonstrates the waiver and release's clarity. See id. As said, Geoffroy had twenty-one days to review the waiver and release and chose not to revoke the separation agreement.

Geoffroy received independent advice through his union. Geoffroy testified that he consulted with Rose, Bombard, and Clancy

---

[7] The only factor that does not, the respective roles in drafting the separation agreement, also does not evidence that the separation agreement was involuntary.

[8] Geoffroy's education parallels that of the plaintiff in Melanson. There, the court concluded that the plaintiff was "not deficient in education [because] she graduated from high school with honors and was enrolled in college courses." Id.

- 15 -

before signing the separation agreement.[9]  Rose advised Geoffroy that he should resign, but told him that it was Geoffroy's choice to make.  Bombard, Geoffroy's union representative, "tried to talk [Geoffroy] out of [resigning]" but Geoffroy "insisted" on resigning.  Finally, Clancy, the union attorney, counseled Geoffroy on the separation agreement before Geoffroy signed it.[10]

Finally, Geoffroy received extremely valuable consideration for waiving the claims.  Instead of facing termination (and so losing his pension) for threatening Phongsaly, he received six months of pay for his accrued leave, his pension, and the promise of a neutral reference from the Town.  The waiver and release account for part of this consideration.  Geoffroy chose the option far more beneficial to him.  The consideration was more than sufficient.

Finally, Geoffroy's assertion he was under "significant distress" (presumably at the thought of losing his job) does not, without more, show duress.  See Melanson, 281 F.3d at 277.

---

[9]  Geoffroy also stated that he "may have talked to a couple of friends."

[10]  The parties dispute the sufficiency of the advice given by Clancy, Rose, and Bombard.  But the facts disputed are not material.  First, Geoffroy cannot create a dispute of material fact by stating he did not consult with Rose, Bombard, and Clancy, when he testified earlier that he did.  See Melanson, 281 F.3d at 277 n.5 ("A party may not create an issue of fact by submitting an affidavit . . . that clearly contradicts the affiant's previous deposition testimony.").  Second, Geoffroy does not cite any cases or evidence demonstrating these consultations were insufficient.

Geoffroy's choice not to revoke the separation agreement in the seven-day OWBPA revocation period following his signing bulwarks our conclusion.

C.    Geoffroy's Argument that the District Court Abused its Discretion in Withdrawing Exhibit 54 Is Meritless.

Geoffroy has doubly waived his argument that the district court abused its discretion by withdrawing Exhibit 54. Even if he had not, there was clearly no abuse of discretion and no harm.

Geoffroy first waived this issue by not objecting to the district court withdrawing Exhibit 54. See United States v. Meserve, 271 F.3d 314, 324 (1st Cir. 2001). Geoffroy concedes that he did not object and argues that the district court did not give him "an opportunity to object." But, while outside the presence of the jury, the district court asked Geoffroy to confirm the exhibit number of the regulation so the court could withdraw it. Geoffroy could have preserved an objection then.

Geoffroy also waived this argument by omitting it from his motion for a new trial. See Sampson v. Eaton Corp., 809 F.2d 156, 161 (1st Cir. 1987). His motion argues that the district court's instructions "confused the jury,"[11] but it does not address

---

[11]    To the extent Geoffroy argues on appeal that the district court's jury instructions were an abuse of discretion, he has waived this argument by failing to develop it. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

the withdrawal of Exhibit 54.  Geoffroy did not "raise[] squarely" the "legal theor[y]" that the district court abused its discretion in withdrawing the exhibit, so it is waived.  United States v. Nygren, 933 F.3d 76, 88 n.3 (1st Cir. 2019) (quoting Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992)).

Even if Geoffroy had properly preserved this argument, it would still fail.  The defendants introduced Exhibit 54 to support Livingston's testimony that he relied on the regulation in denying Geoffroy the identification card.  But because Livingston could not have properly relied on a regulation with an effective date after the denial, the exhibit could not serve this purpose.[12] In consequence, the district court did not abuse its discretion in withdrawing it.

Moreover, the record supported the jury verdict (e.g., that Livingston also relied on his conversation with Brooks on good standing).  It was "highly probable" that the withdrawal of

---

[12]    Geoffroy argues, had the jurors seen the exhibit, "they would have seen . . . [that] Livingston couldn't have possibly 'relied' on it."  But the "jurors are presumed to have followed the [district] court's instructions" not to consider the exhibit, which forecloses this argument.  Río Mar Assocs., LP, SE v. UHS of P.R., Inc., 522 F.3d 159, 163 (1st Cir. 2008).
        Geoffroy also implies that the jury would have inferred from the regulation's effective date that Livingston lied about his good standing determination.  To the extent Geoffroy makes this argument, it is waived for lack of development.  Zannino, 895 F.2d at 17.

Exhibit 54 "did not affect the outcome of the case," and so was harmless.  McDonough v. City of Quincy, 452 F.3d 8, 19-20 (1st Cir. 2006).

III.

Affirmed.