# United States Court of Appeals
## For the First Circuit

No. 24-1499

JOANNE WALSH,

Plaintiff, Appellant,

v.

HNTB CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Montecalvo, Rikelman, and Aframe
Circuit Judges.

Michaela C. May, with whom Zachary H. Hammond and Bennett &
Belfort, P.C. were on brief, for appellant.

Mark C. Tatum, with whom Stephen I. Hansen and Shook, Hardy
& Bacon were on brief, for appellee.

March 13, 2026

**AFRAME**, <u>Circuit Judge</u>.    Joanne Walsh worked for many years as an information technology ("IT") employee for HNTB Corporation in its Boston, Massachusetts office.  In August 2019, the company placed Walsh on a three-month performance improvement plan ("PIP") that she successfully completed.  About ten months later, Walsh resigned.  She then sued HNTB alleging, inter alia, that the company committed unlawful age discrimination, primarily by placing her on the PIP and then constructively discharging her.

The district court granted HNTB summary judgment on the grounds that no reasonable factfinder could conclude that the PIP constituted an adverse employment action or that Walsh resigned in circumstances that constituted a constructive discharge.  Walsh appealed.  In response, HNTB challenged the timeliness of the appeal and defended the judgment on the merits.  We conclude that the appeal is timely and affirm the judgment.

## I.

We start with the timeliness issue.  HNTB contends that we cannot hear this appeal because Walsh belatedly filed her notice of appeal.  We describe the relevant procedural facts and then explain why Walsh's appeal is timely.

On December 21, 2023, the district court granted summary judgment for HNTB.  Following the judgment, Walsh's trial counsel stopped the representation.  On January 19, 2024, within the thirty-day period to file an appeal, <u>see</u> 28 U.S.C. § 2107(a); Fed.

R. App. P. 4(a)(1)(A), Walsh moved pro se to extend the notice-of-appeal deadline because she needed more time to find new counsel. The court granted that motion and allowed Walsh until March 29, 2024, to file her notice of appeal. Walsh subsequently asked for two more extensions, each of which the court granted. She filed her formal notice of appeal on May 15, 2024.

The crux of HNTB's argument is that Walsh's January 19 motion to extend the notice of appeal deadline was her only timely extension request under 28 U.S.C. § 2107 and Federal Rule of Appellate Procedure ("Rule") 4. See Fed. R. App. P. 4(a)(1)(A). According to HNTB, since Walsh did not file a notice of appeal within the additional time granted pursuant to that request, her May 15 notice of appeal was ineffective. Walsh responds that we should treat her January 19 motion as the functional equivalent of a notice of appeal and thus deem her appeal timely. We agree with Walsh.

Rule 3(c) requires a notice of appeal to contain three pieces of information, which we soon will detail. See Fed. R. App. P. 3(c)(1). The Rule also cautions that "[a]n appeal must not be dismissed for informality of form or title of the notice of appeal." Id. at 3(c)(7).

Based in part on this latter provision, courts "liberally construe" Rule 3. Smith v. Barry, 502 U.S. 244, 248 (1992). Thus, regardless of how a filing is styled, it will

- 3 -

constitute the "functional equivalent" of a notice of appeal "[i]f [the] document [was] filed within the time specified by Rule 4 [and] gives the notice required by Rule 3." Id. at 248-49. In determining whether a particular filing satisfies Rule 3, we are mindful of the "latitude" given to "pro se litigant[s]." Campiti v. Matesanz, 333 F.3d 317, 320 (1st Cir. 2003).

A motion to extend the notice of appeal deadline may serve as the functional equivalent of a notice of appeal if, among other things, it is filed within the time allotted to file such a notice. Cruzado v. Alves, 89 F.4th 64, 71-73 (1st Cir. 2023). There is no dispute that Walsh filed her January 19 motion within the initial thirty-day period allotted for filing a notice of appeal. See 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1). Thus, the remaining question is whether the motion evinces an intent to appeal and contains the "pertinent information" required by Rule 3(c)(1). Cruzado, 89 F.4th at 72 (quoting Campiti, 333 F.3d at 320). In making those determinations, we rely on "the filing's content and surrounding circumstances rather than on any general rule." Id. at 70 (quoting Campiti, 333 F.3d at 320) (citation modified).

First, Walsh's motion demonstrates an intent to appeal. A motion to extend the notice of appeal deadline indicating only that a litigant is considering an appeal does not suffice. Cruzado, 89 F.4th at 71. But Walsh's motion does more than that.

She stated that she needed an extension because her "(former) attorney [told her] . . . that their firm does not handle appeals" and she was "actively searching for a firm to represent [her]" on appeal. We understand this statement to indicate Walsh's intent to appeal once she retained counsel, thereby satisfying the first step in the functional equivalent analysis. See Campiti, 333 F.3d at 320 (concluding that a request for appointment of appellate counsel, after trial counsel withdrew, "evidences an intention to appeal").

Walsh's motion also contains the "pertinent information" required by Rule 3(c)(1). Cruzado, 89 F.4th at 72 (quoting Campiti, 333 F.3d at 320). Under that Rule, a proper notice of appeal must name the parties taking the appeal, the court to which the appeal is being made, and the judgment or order from which the appeal is being taken. Fed. R. App. P. 3(c)(1). Walsh's motion meets the first Rule 3(c)(1) requirement because the caption identifies her and HNTB. See Cruzado, 89 F.4th at 72. In addition, Walsh's motion satisfies Rule 3(c)(1)'s appeal-location requirement even though it does not expressly identify this Court as the appeal's destination. Walsh sought to appeal a judgment from the District of Massachusetts in an employment case that could only be appealed to this Court. We have held that the failure to expressly mention this Court is not fatal where it is the only appropriate appellate venue. Id.; Campiti, 333 F.3d at 320.

- 5 -

Walsh's motion also adequately references the judgment she sought to appeal. See Fed. R. App. P. 3(c)(1)(B). While Walsh's January 19 filing does not expressly mention the order granting summary judgment, it does mention the case's docket number. A review of the docket indicates that the summary judgment order was the only substantive ruling in the case. And it also shows that the district court issued a final judgment shortly after its summary judgment ruling, which means that any interlocutory orders merged into that judgment. See Gonpo v. Sonam's Stonewalls & Art, LLC, 41 F.4th 1, 10-11 (1st Cir. 2022) (citing Fed. R. App. P. 3(c)(4)). We have concluded previously that a litigant met this final Rule 3 requirement in similar circumstances. See Cruzado, 89 F.4th at 72-73.

In sum, Walsh filed a timely motion to extend the notice of appeal deadline. It indicated her intent to appeal and contained sufficient information to meet Rule 3's requirements. Especially given the solicitude we afford Walsh as a then-pro se litigant, we are satisfied that her January 19 motion was the functional equivalent of a notice of appeal. The appeal is thus timely, and so we proceed to its merits.[1]

---

[1] Walsh also argues that even if her January 19 request for an extension of time was not the functional equivalent of a notice of appeal, we should still find her formal notice of appeal timely because the district court appropriately granted equitable tolling of the filing deadline for her notice of appeal. See Hamer v. Neighborhood Servs. of Chi., 583 U.S. 17, 22-24 (2017). We do

- 6 -

In reviewing the district court's grant of HNTB's motion for summary judgment, we describe the underlying facts in the light most favorable to Walsh, the non-moving party. See Warner v. DeJoy, 153 F.4th 109, 112 (1st Cir. 2025).

Walsh worked for HNTB from the end of January 1994 until September 2020. When Walsh left HNTB, she was fifty-five years old and worked as a Technology Support Representative II ("TSR II"). As a TSR II, Walsh supported the company's IT systems, which included, among other tasks, assisting employees with their technology needs and managing HNTB equipment and leases.

Walsh supported IT for multiple HNTB offices, including the Boston office from which she worked. From 2015 to 2017, Walsh's supervisor encouraged her to consider advancing to the TSR III position, but Walsh declined that invitation.

In 2018, Jim Clark became Walsh's new supervisor. Clark wrote Walsh's performance review that year and rated her as having "[m]et [e]xpectations" but noted that her rating was "at the lowest in the range." In the review, Clark wrote that Walsh lacked "initiative to stretch beyond the day-to-day and status quo of the Boston area offices" and did not "improve upon any of the necessary

not reach this argument because we have already found Walsh's January 19 motion to satisfy the notice-of-appeal requirement.

HNTB characteristics" identified in the prior year's review. Clark ended the review by noting that the present circumstances "put [Walsh] at risk of not meeting expectations and may result in a performance improvement plan."

On August 1, 2019, Walsh was placed on a PIP at the same time as was her slightly older colleague, Lindsay Allinson, the other TSR II who worked with Walsh to support the Boston office. Clark drafted these PIPs at the direction of his supervisors. The two PIPS were almost identical.

Walsh's PIP stated that there was "[r]ecent feedback from office staff [and] office/division leadership [stating] that [Walsh] ma[de] it difficult to get things done [and was] perceived to be an impediment to the success/performance of the office." In particular, the PIP noted that the office perceived Walsh as "contentious, pushing back on suggestions/ideas and unwilling to look for solutions before saying something can't be done." The PIP also indicated that Walsh "'hid[]' in the IT room," was "reluctant to engage with employees proactively," and "d[idn't] adequately represent the customer service focus that is critical to the success of a Technology Support Representative at HNTB." In addition to these concerns, the PIP criticized Walsh for not properly maintaining the IT office, which made it difficult for other employees to "access IT resources." The PIP concluded its critique by noting that Walsh had failed "to act on and improve

the performance issues identified in [her] 201[8] Performance Review," including that she "stretch beyond the status quo to meet performance expectations."[2]  The PIP lasted three months and provided a list of necessary performance improvements that correlated to the criticisms just described.

While on the PIP, Walsh asked Clark to provide her with the names of staff who complained about her performance.  Clark declined the request, and Walsh attempted to identify on her own who had complained.  Walsh described Clark as "pissed" that she continued to try to identify those who had complained about her.  In response to Walsh's actions, Clark told Walsh, "Stop asking. Stop talking to people.  Shut up."

During the PIP period, Dan Vealey, another longtime HNTB IT employee, worked as Walsh's team leader and thus was responsible for assisting Walsh with successfully completing the PIP.  At some point while Walsh was on the PIP, Vealey told her that "[t]he company is not getting its return on investment for you," and that she could "be replaced with younger, cheaper people."

Nevertheless, Vealey ultimately concluded that Walsh successfully completed the PIP, which ended on November 1, 2019.

---

[2]  The PIP refers to the 2019 performance review.  We understand that to be a typographical error because the 2019 performance review had not been completed in August 2019, and the information identified in the PIP does appear in the 2018 performance review.

Clark concurred, although he also told Walsh that she "had barely improved enough to get off the PIP." Sometime in November or December 2019, after the PIP concluded, Vealey succeeded Clark as Walsh's supervisor.

A few months after the PIP ended, Vealey completed Walsh's 2019 performance evaluation. The evaluation stated that Walsh "[i]nconsistently [m]et [e]xpectations" and that 2019 was "a somewhat turbulent year" for Walsh with "some mixed results." Vealey's review also provided Walsh with some praise, including, for example, that she "performed the normal daily activities as consistently as she ha[d] in the past" and that "[h]er technical skills [were] very solid."

After the PIP, Walsh felt that her working conditions declined. In particular, Vealey "would take credit for things that" she and Allinson had done. Moreover, Vealey "t[ook] over things" that Walsh and Allinson had been "working on" until the project "started to go sideways, [when] all of a sudden" he would place responsibility back with them. Vealey also instructed Walsh to avoid saying "no" to employees who made technology requests that Walsh thought could not be met. Rather, he asked Walsh to say that she would check with her supervisor first and then respond to the employee following the consultation.

On one occasion after Walsh completed the PIP, Vealey yelled at her, stating that he was her "manager" and could "tell

- 10 -

[her] anything [he] want[ed]." Vealey also pressured Walsh to respond to IT requests faster than necessary and, according to Walsh, he often "ma[d]e mountains out of molehills" by not "listen[ing] to [her] side of the story." Further, Walsh believed that Vealey complimented younger TSR IIs working in other offices, without crediting her and Allinson for similar work.

Between the end of the PIP and her resignation, Walsh never complained to human resources or submitted a complaint to HNTB's "hotline" system about being mistreated by Vealey or anyone else. Walsh was not demoted from her TSR II position, and her compensation was not reduced. No one at HNTB ever asked or told Walsh to leave her employment. Nevertheless, on September 11, 2020, about ten months after Walsh had successfully completed the PIP, she and Allinson simultaneously resigned from HNTB and "quietly walk[ed] out" together.

After her resignation, Walsh sued HNTB in Massachusetts state court, asserting claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and Massachusetts's law prohibiting age discrimination in employment, see Mass. Gen. Laws ch. 151B, § 4(18) ("Chapter 151B"), along with a claim for the breach of the implied covenant of good faith and fair dealing under state law. HNTB removed the case to federal court and after discovery, moved for summary judgment.

The district court granted HNTB's summary judgment motion. It ruled that Walsh had not suffered an adverse action by being placed on a PIP because "Walsh successfully completed the PIP," she "was neither demoted nor her pay reduced," and "any changes in her responsibilities were de minimis." The court also concluded that the constructive discharge allegation failed because the complained-of comments from management occurred months before Walsh resigned; the post-PIP changes under Vealey's supervision were not substantial enough to show that Walsh was forced to resign; and there was no evidence that HNTB was contemplating dismissing Walsh when she decided to quit. Finally, the court rejected Walsh's claim for a breach of the implied covenant of good faith and fair dealing. Walsh appeals the summary judgment ruling only insofar as it grants HNTB summary judgment on the federal and state age-discrimination claims.

**III.**

We review de novo the district court's summary judgment ruling in favor of HNTB. Johansen v. Liberty Mut. Grp., 118 F.4th 142, 148 (1st Cir. 2024). That ruling is warranted only if the undisputed material facts, taken "in the light most favorable to" Walsh, demonstrate that HNTB is entitled to judgment as a matter of law. Escribano-Reyes v. Pro. Hepa Certificate Corp., 817 F.3d

- 12 -

380, 386 (1st Cir. 2016) (quoting Del Valle-Santana v. Servicios Legales de P.R., Inc., 804 F.3d 127, 129 (1st Cir. 2015)).

The parties agree that Walsh's claims under the ADEA and Chapter 151B may be considered together because the laws are "'substantially similar' in all relevant respects." Adamson v. Walgreens Co., 750 F.3d 73, 83 (2014) (quoting Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007)). The parties also agree that Walsh's claims should be considered by applying the burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). In these circumstances, that framework requires, inter alia, the plaintiff to establish a prima facie case of discrimination by adducing some evidence that (1) she was at least forty years of age; (2) her job performance met the employer's legitimate expectations; (3) the employer subjected her to an adverse employment action; and (4) the employer did not treat her in an age-neutral manner when taking the adverse action. Del Valle-Santana, 804 F.3d at 129-30.

As mentioned above, the district court granted HNTB summary judgment on the ground that Walsh failed to present sufficient evidence that the company subjected her "to an adverse employment action," the third aspect of the prima facie inquiry. On appeal, Walsh makes two arguments on this point. First, she asserts that under the Supreme Court's decision in Muldrow v. City of St. Louis, 601 U.S. 346 (2024), which was issued after the

- 13 -

district court's summary judgment ruling, several of HNTB's actions -- the August 2019 PIP, a cessation in pay raises, and an alleged decrease in job duties -- should be considered adverse actions. Second, she contends that she suffered a constructive discharge -- an adverse action tantamount to termination, see Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) -- because, starting with the PIP, her work environment deteriorated so much so that she had no choice but to resign in September 2020.

**A.**

**1.**

We start with Walsh's Muldrow-based contentions. The ADEA prohibits age discrimination when it negatively affects an employee's "compensation, terms, conditions, or privileges of employment." 29 U.S.C. § 623(a)(1). Actionable employer conduct thus "typically involves discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). For some time, in various discrimination contexts, we required plaintiffs to show that the adverse action was material, i.e., that the challenged conduct was "more disruptive than a mere

inconvenience or an alteration of job responsibilities." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002) (citation omitted); see also, e.g., Cherkaoui v. City of Quincy, 877 F.3d 14, 25 (1st Cir. 2017); Caraballo-Caraballo v. Corr. Admin., 892 F.3d 53, 61 (1st Cir. 2018).

Muldrow, which was decided about six months after the district court granted HNTB's summary judgment motion, rejected this materiality requirement in a sex discrimination case under Title VII of the 1964 Civil Rights Act. 601 U.S. at 353 & n.1. Muldrow held that an adverse action is any employment event, regardless of its severity, in which an employer's conduct leaves an employee (1) "worse off" (2) with respect to the "terms [or] conditions" of their employment. Id. at 354-55.

Though Muldrow arose under Title VII, its analysis hinged on the statutory phrase "'terms or conditions' of employment." 601 U.S. at 354-55; see 42 U.S.C. § 2000e-2. Many other anti-discrimination statutes, including the ADEA, use the same (or similar) language, and thus courts have extended Muldrow to apply to those statutes as well. See, e.g., Arnold v. United Airlines, Inc., 142 F.4th 460, 470 n.21 (7th Cir. 2025) (applying Muldrow to an ADEA claim); Milczak v. Gen. Motors, LLC, 102 F.4th 772, 787 (6th Cir. 2024) (same); Yates v. Spring Indep. Sch. Dist., 115 F.4th 414, 420 n.4 (5th Cir. 2024) (same); 29 U.S.C. § 623(a)(1) (prohibiting age discrimination when it negatively

- 15 -

affects an employee's "compensation, terms conditions, or privileges of employment."); see also Rios v. Centerra Grp., Inc., 106 F.4th 101, 112 n.4 (1st Cir. 2024) (applying Muldrow to a claim under the Americans with Disabilities Act). We will therefore apply the Muldrow standard in deciding whether the discrete actions identified by Walsh constitute adverse employment actions under the ADEA and Chapter 151B.[3]

**2.**

Because Walsh focuses most on her August 2019 PIP, we begin our analysis there.[4] A PIP does not have the same effect in

---

[3] No Massachusetts appellate court has decided whether to adopt the Muldrow standard under the Massachusetts anti-discrimination law, Chapter 151B. Because the Muldrow standard is more favorable to Walsh than present Massachusetts law, which still requires materiality, Yee v. Mass. State Police, 121 N.E.3d 155, 161-62 (Mass. 2019), we will assume that Muldrow also applies to Walsh's Chapter 151B claim, O'Horo v. Bos. Med. Ctr. Corp., 131 F.4th 1, 18 n.7 (1st Cir. 2025). Even under this more generous standard, Walsh's claims do not survive. See infra Part III.A.2-3.

[4] At times on appeal, Walsh describes her Muldrow-based arguments as a hostile work environment claim. Indeed, at oral argument, Walsh's attorney suggested that following Muldrow, courts may no longer distinguish between discrete adverse actions and continuing violations when evaluating anti-discrimination claims. These arguments are unavailing.

First, to the extent Walsh argues that Muldrow elided the distinction between claims based on continuing violations and claims based on discrete acts, we disagree. In National Railroad Passenger Corp. v. Morgan, the Supreme Court drew a line between these two types of claims and explained that each could give rise to separate forms of anti-discrimination claims -- events like terminations, demotions, and suspensions made up the former, and circumstances like hostile work environments constituted the

- 16 -

every employment situation.  Sometimes, an employer may issue a PIP to warn an employee about performance deficiencies or assist an employee in developing a plan to achieve an identified opportunity for skill development.  See, e.g., Arnold, 142 F.4th at 467-68, 471.  In those cases, a PIP is not an adverse employment action.  See id. at 471 (stating, post-Muldrow, that a PIP did not constitute an adverse action where any changes caused by the PIP were "within the normal scope of [the plaintiff's] employment and thus did not adversely affect the terms and conditions of her employment").  Other times, a PIP may impose new job responsibilities, change the present terms of employment, or deprive an employee of potential advancement opportunities.  See, e.g., Anderson v. Amazon.com, Inc., 23-cv-8347(AS), 2024 WL 2801986, at *11-12 (S.D.N.Y. May 31, 2024).  In these situations, a PIP may serve as an adverse employment action.  See id. (concluding that, under Muldrow, a PIP constituted an adverse employment action where it, inter alia, "saddl[ed] [the plaintiff]

_____

latter.  536 U.S. 101, 114-15 (2002).  Muldrow did not purport to abrogate Morgan, and we have continued to distinguish between the two types of claims since Muldrow.  See, e.g., Rae v. Woburn Pub. Schs., 113 F.4th 86, 102 (1st Cir. 2024).

        Second, to the extent Walsh contends that she brought a hostile work environment claim, the record belies that assertion. In the district court, Walsh did not argue that she suffered a hostile environment separate from her constructive discharge contention, which we discuss below.  Thus, we do not analyze Walsh's claim under a hostile work environment rubric.

with more and worse tasks, tarnish[ed] her permanent record, dampen[ed] her prospects of a promotion or raise, [and] temporarily prevent[ed] her from transferring"). Post-Muldrow, then, there is no one-size-fits-all answer for whether a PIP constitutes an adverse employment action. Rather, the inquiry is fact-intensive and PIP-specific. We therefore examine the particulars of Walsh's PIP to determine whether it affected the terms or conditions of her employment.

It did not. The PIP identified its purpose as providing Walsh with "the opportunity to correct [her] unsatisfactory performance." It then identified several problem areas and provided a corresponding list of ways to improve. The PIP stated that Walsh should "be more proactive" and act as an "advocate" for the offices she supported; it also stated that Walsh should clean her office because it was so messy that it made "it difficult for employees to access IT resources." The PIP did not assign Walsh new duties, alter her title or compensation, or limit her ability to seek other opportunities within the company. Its only reference to a term of employment was the company's reservation of its right to terminate Walsh's employment before the end of the plan. But Walsh has not argued that she was anything other than an at-will employee before, during, or after the PIP. See Murray v. Warren Pumps, LLC, 821 F.3d 77, 89 (1st Cir. 2016) (In Massachusetts, unless a termination "conflict[s] with [a] sufficiently important

- 18 -

and clearly defined public polic[y]," "an employer may lawfully terminate a relationship with an at-will employee at any time -- for any reason, for no reason, and even for a reason that might be seen by some as unwise or unkind."). Thus, that reference did not change the terms or conditions of Walsh's employment. The PIP, on its face, appears to be nothing more than "documented counseling." McNeal v. City of Blue Ash, 117 F.4th 887, 903 (6th Cir. 2024) (stating that documented counseling is unlikely to be an adverse action under Muldrow).

Walsh does not dispute this characterization of the PIP. Instead, she argues that its existence alone is an adverse action and assigns it a more sinister cast by alleging that her managers imposed it because of her age. But, as we have explained, a per se rule that all PIPs constitute an adverse action is inconsistent with Muldrow's requirement that the employee demonstrate a change in the terms or conditions of employment. And even accepting for argument's sake that Walsh's PIP was motivated by age bias, and recognizing an objectively reasonable person may well experience distress from being placed on a PIP, Walsh still has not shown how it altered her employment conditions, which is the focus of our analysis post-Muldrow. The PIP's imposition therefore does not qualify in these circumstances as actionable conduct under the ADEA or Chapter 151B.

- 19 -

**3.**

The other incidents that Walsh identifies as adverse actions under Muldrow also do not suffice. First, she argues that she stopped receiving pay raises during her final three years of employment. In the district court, Walsh did not contend that this harm constituted an adverse action, and thus her argument is waived. See Geoffroy v. Town of Winchendon, 959 F.3d 1, 7 n.5 (1st Cir. 2020). But even on the merits, this contention founders. Walsh was ineligible for a pay raise in those years because she had reached the top of the salary range for a TSR II employee. Her only responses to this fact are to say that she had not been "told" that she had reached the pay ceiling for a TSR II and that her maximum salary range could have been increased following a "market adjustment." But she does not create a dispute of material fact on this point because she does not identify any evidence suggesting that there was in fact a market adjustment Cf. Milczak, 102 F.4th at 786 ("While an employer's withholding of a discretionary raise or bonus that an employee is otherwise entitled to based on the terms and conditions of employment may constitute an adverse action, [the plaintiff] does not create a material question that he was entitled to an annual raise or annual bonus greater than what he received" when he fails to provide evidence "that he should have received more."). Moreover, her ignorance of

- 20 -

the maximum salary for her position does not mean that it did not exist.

Second, Walsh argues that she was stripped of various job duties. Muldrow makes clear that the loss of job duties can constitute an adverse action. 601 U.S. at 356. Here, however, Walsh never identifies the job duties that she lost; her conclusory statements do not establish a trial-worthy issue. See Mancini v. City of Providence, 909 F.3d 32, 44 (1st Cir. 2018). And the few record cites that Walsh provides lead only to allegations that Vealey would sometimes take over for her and Allinson. But in that same portion of the deposition, Walsh explained that this mostly happened to Allinson. And, in any event, Walsh acknowledged that Vealey would restore the responsibilities as soon as any difficulty arose. Summary judgment is thus appropriate for Walsh's Muldrow-based claims.

## B.

We turn now to Walsh's claim alleging that she suffered an adverse action through a constructive discharge. An employer terminating someone's employment is an obvious adverse employment action. 29 U.S.C. § 623(a)(1). And the law is clear that "[a]n employer cannot accomplish by indirection what the law prohibits it from doing directly." Suárez, 229 F.3d at 54. So, a constructive discharge constitutes an adverse employment action. Id.

An employee's resignation morphs into a constructive discharge when "the working conditions . . . become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Suárez, 229 F.3d at 54. The standard is based on objective reasonableness. Cherkaoui, 877 F.3d at 30.[5] It is also rigorous: an employee is not guaranteed "a workplace free from the usual ebb and flow of power relations and inter-office politics," and must endure the "ordinary slings and arrows that workers routinely encounter in a hard, cold world." Stratton v. Bentley Univ., 113 F.4th 25, 40 (1st Cir. 2024) (first quoting Suárez, 229 F.3d at 54 and then quoting Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 51 (1st Cir. 2008)). Ultimately, the question reduces to whether a factfinder could determine that "the working conditions were so unpleasant that staying on the job while seeking redress would have been intolerable." Marrero, 304 F.3d at 28 (citation modified) (quoting Keeler v. Putnam Fiduciary Tr. Co., 238 F.3d 5, 10 (1st Cir. 2001)).

In the district court, Walsh emphasized comments made to her by Clark and Vealey while she was on the PIP. The court concluded that these comments occurred at least ten months before

---

[5] Muldrow is not relevant in evaluating the constructive discharge claim given that Walsh resigned from her position. See Stratton v. Bentley Univ., 113 F.4th 25, 38 n.6 (1st Cir. 2024).

- 22 -

Walsh resigned and therefore reasonably could not be viewed as the impetus for her resignation.

Walsh argues on appeal that the district court erroneously isolated Clark's and Vealey's comments during the PIP period from HNTB's post-PIP conduct. She contends that a factfinder could conclude that HNTB's conduct, when considered in the aggregate, created circumstances so intolerable that she had no choice but to quit. We agree that in adjudicating a constructive discharge claim, a court must view the employer's conduct holistically. Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 562-63 (1st Cir. 1986); Back v. Hapoalim, 24-1064-cv, 2024 WL 4746263, at *3 & n.1 (2d Cir. Nov. 12, 2024). But even so, the evidence, viewed together, does not permit a reasonable conclusion that Walsh had no option but to resign.

We begin with Clark's and Vealey's comments during the PIP period. Clark told Walsh to "shut up" and to "stop asking" in response to Walsh's request that he identify the employees who had complained about her. Walsh acknowledged that Clark was "pissed" at her behavior and that his comment was made in response to her requests. While Clark's comment may have been harsh, its context shows that it was a verbal "arrow[]" that may occur during a disagreement in a difficult situation; such a comment is not the stuff of an intolerable workplace. Stratton, 113 F.4th at 39-40 (stating that remarks by a supervisor that may have been

- 23 -

"insensitive, unfair, or unreasonable" do not show an objectively intolerable workplace).

Similarly, Vealey's comment about Walsh being replaced with "younger, cheaper people" may suggest age animus but also does not demonstrate an environment that would compel a reasonable person to resign. That conclusion is evident from Walsh's decision to continue working long after Vealey made the comment. See Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 613 (1st Cir. 2000) (holding that conduct occurring seven months before a resignation cannot form the basis of a constructive discharge). And it also accords with our precedent that employer comments suggesting possible age bias are not themselves grounds for quitting. See Torrech-Hernández, 519 F.3d at 51 (concluding that there was no constructive discharge even though employer made age-related comments that plaintiff lacked the "same 'energy' he once had" and used the term "dinosaur"); Suárez, 229 F.3d at 56 (similar).

Turning to the post-PIP conduct, many of Walsh's allegations depend more on her "subjective beliefs" than objective facts and thus cannot form the basis of her constructive discharge. Gerald v. Univ. of P.R., 707 F.3d 7, 25 (1st Cir. 2013) (quoting Roman v. Potter, 604 F.3d 34, 42 (1st Cir. 2010)). These complaints relate in large measure to how Walsh perceived Vealey's management style. As mentioned earlier, Vealey assumed direct

- 24 -

supervision over Walsh shortly after the PIP ended. During the post-PIP period, Walsh describes Vealey as often "mak[ing] mountains out of molehills," not "listening to [her] side of the story," "micromanag[ing]" everything she and Allinson did, "tak[ing] credit for things" that they had done, and complimenting younger employees for work she had also done. She also says that Vealey once (at an unidentified time) raised his voice toward her to assert his authority and pressured her to respond to employee requests more rapidly than was previously required. Finally, Walsh alleges that Vealey "infantiliz[ed]" her by asking that she confer with him before saying "no" to employees who made requests she did not think could be fulfilled.

Walsh's complaints about her new manager's actions do not objectively rise to the level of intolerable working conditions. Vealey sometimes may have engaged in "generally disagreeable behavior." Stratton, 113 F.4th at 39 (quoting Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010)). But the employment discrimination laws do not shield an employee from the "usual ebb and flow of power relations" that may come after the assignment of a new supervisor. Suárez, 229 F.3d at 56. While Walsh no doubt perceived some of Vealey's management to be unfair, Vealey also made multiple positive comments in her 2019 employment evaluation. Viewed through an objective lens, we simply do not think a reasonable factfinder could conclude that Vealey's conduct after

the PIP, even when taken together with his and Clark's comments during the PIP, created a situation so intolerable that resignation was Walsh's only option.

Walsh also contends that she was constructively discharged because she "believed at the end of the PIP that she was going to be fired." It is true that an employer's repeated statement informing an employee that she "will be fired" may show a constructive discharge. Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 97 (1st Cir. 2018). But there is no evidence here of such a statement (let alone multiple). Walsh successfully completed the PIP, even though Clark told her that she had "barely" done so. While Walsh may have viewed the PIP as setting the stage for her termination, "apprehension of future termination is insufficient to establish constructive discharge." Stratton, 113 F.4th at 40 (quoting Torrech-Hernández, 519 F.3d at 52). Moreover, Walsh admits that after she completed the PIP, no one ever asked her to leave her position and her 2019 performance review never suggested that her employment was in jeopardy. Instead, she and Allinson decided to "quietly walk out" on a day of their choosing.

Ultimately, the record shows that Walsh was a long-tenured and generally successful HNTB employee who was dismayed that the company placed her on a PIP in 2019. Walsh views that decision as a step in HNTB's age-motivated scheme to push her out. But for Walsh's constructive discharge claim to proceed to

trial, she must show more than "unpleasantness, hurt feelings, and wounded pride." Suárez, 229 F.3d at 51. For the reasons discussed, she has not done so.

**Affirmed**.